Marjorie A. Elken, OSB No. 073368
MAE@buckley-law.com
BUCKLEY LAW P.C.
5300 Meadows Road, Suite 200
Lake Oswego, OR  97035
Telephone: +1 503 620 8900
Facsimile: +1 503 620 4878

Damond R. Mace (*pro hac vice* to be filed)
Sean L. McGrane (*pro hac vice* to be filed)
Marissa Black (*pro hac vice* to be filed)
damond.mace@squirepb.com
sean.mcgrane@squirepb.com
marissa.black@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
4900 Key Tower
127 Public Square
Cleveland, Ohio  44114
Telephone: +1 216 479 8500
Facsimile: +1 216 479 8780

*Of Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| DAT SOLUTIONS, LLC,<br><br>        Plaintiff,<br><br>   v.<br><br>CONVOY, INC.,<br><br>        Defendant. | Case No.: 3:22-CV-00088<br><br>COMPLAINT FOR TRADE SECRET MISAPPROPRIATION, BREACH OF CONTRACT, UNJUST ENRICHMENT, UNFAIR COMPETITION, TORTIOUS INTERFERENCE, AND OTHER RELIEF<br><br>DEMAND FOR JURY TRIAL |

PAGE 1 – COMPLAINT

Plaintiff DAT Solutions, LLC ("DAT") hereby files its Complaint against Defendant Convoy, Inc. ("Convoy") and states as follows:

## NATURE OF THE CASE

1.    Plaintiff DAT was founded in Portland, Oregon, nearly 45 years ago.  Since then, DAT has created and maintains the most recognized "freight market" in North America.  A freight market allows long-haul truckers and other carriers of freight to connect with entities that need to have freight shipped from one point to another.  In the industry, a freight market is commonly referred to as a "load board."

2.    The DAT load board began at a truck stop in Portland in 1978—an actual bulletin board where truckers could go to find jobs carrying freight.  Since then, DAT has spent over forty years innovating, expanding, and investing in its load board, which has become the most recognized, most sophisticated, and most comprehensive freight market in the United States. Today, as a result of DAT's more than forty years of innovation and investment, approximately 900,000 loads of freight are posted each business day to the DAT load board, which can be easily accessed by market participants through mobile app, internet, telephone, fax, and other means. The DAT load board has facilitated approximately $110 billion in freight transactions.  Moreover, DAT has used its decades of experience and know-how in the freight industry to create proprietary pricing products and other data and information that cannot be found anywhere else in the world— only through the DAT load board.

3.    Defendant Convoy has no long-term background or experience in the freight industry, and is a venture capital, private-equity backed firm that was founded by tech executives in Seattle in 2015.

PAGE 2 – COMPLAINT

4.      In 2016, Convoy entered into a contract with DAT that allowed Convoy to access the DAT load board.  Per the terms of the parties' agreement, Convoy was given a limited license to use and access the DAT load board, with the express "understanding that the data provided [wa]s from proprietary sources" and was to be used by Convoy only for certain limited purposes.

5.      In entering the contract, Convoy claimed it was a freight "broker" that was hired by third parties to facilitate the carriage of freight.  Ostensibly, Convoy sought access to the DAT load board to post its clients' freight and to find carriers to ship that freight.  In reality, however, Convoy was accessing the DAT load board in order to misappropriate data and trade secrets belonging to DAT, and to surreptitiously create its own competing load board by using DAT's data and trade secrets.  Convoy recently unveiled its competing load board in November 2021.

6.      Convoy's secret creation of a competing load board was done in clear and intentional violation of the unambiguous terms of the parties' contract.  The contract specifically limited Convoy's use of the DAT load board to brokerage services, and contained an express provision prohibiting Convoy from creating a competing load board:

> **Non-Compete as a Load Board:** Customer [Convoy] represents and warrants that its use of DAT's Products: (a) is solely for Customer's commercial purposes related to its movement of freight . . . During the Term, Customer may not create a load board wherein they aggregate other brokers' loads with the intent of competing with DAT.

Other provisions of the contract similarly prohibited Convoy from using data and other information on the DAT load board for purposes of creating a competing load board, or for any other purpose besides freight brokerage.

7.      Convoy intentionally breached these provisions for more than a year, however, and hid its conduct from DAT while doing so.  In early-November 2021, after first learning that

PAGE 3 – COMPLAINT

Convoy was creating a competing load board, DAT declined to renew Convoy's access to the DAT load board.  Less than two weeks later, on November 18, 2021, Convoy publicly boasted in press releases and social media postings that it was launching its own competing load board.  Stunningly, in a bald-faced admission that it had breached its contract with DAT, Convoy boasted that it had been creating its competing load board for more than a year, during the exact period it was bound by the non-compete provisions in its contract with DAT:

> "Today's announcement is the result **of more than a year** of hard work, including a tight collaboration between Convoy and the forward-thinking team at USA Truck," said Brooks McMahon, VP for Partnerships [at Convoy].

8.      In short, for at least a year, while it was bound by a clear and express non-compete clause, Convoy was working surreptitiously behind DAT's back to create a competing load board—all while denying to DAT that it was doing so.  Even worse, on information and belief, Convoy was misappropriating DAT's proprietary information and trade secrets and misusing data taken from the DAT load board in order to build Convoy's own competing load board.  Convoy's illegal, surreptitious conduct was willful and malicious, and has harmed—and continues to harm—DAT.

9.      Bad actors like Convoy who steal trade secrets and engage in willful and malicious misconduct are subject to severe penalties under the law.  Accordingly, DAT seeks a permanent injunction to shut down and dismantle Convoy's illegal load board, called "Convoy for Brokers," which Convoy created and operates through the misappropriation of DAT's proprietary data and trade secrets.  DAT also seeks substantial monetary damages from Convoy, including, but not limited to: (i) actual damages suffered by DAT, in an amount to be determined at trial, caused by Convoy's breach of contract, misappropriation of trade secrets, and unjust use of Convoy's

PAGE 4 – COMPLAINT

proprietary data; (ii) exemplary damages in an amount double any monetary damages awarded to

DAT, which are available in light of Convoy's willful and malicious conduct; (iii) other statutory

damages available under the United States Defend Trade Secrets Act and the Delaware Uniform

Trade Secrets Act, respectively; (iv) attorneys' fees, which are recoverable both statutorily and

under the parties' contract; and (v) other relief in favor of DAT that the Court may deem just and

proper.

## PARTIES

10.    Plaintiff DAT is a Delaware limited liability company with its headquarters co-

located in Beaverton, Oregon and Denver, Colorado.

11.    Defendant Convoy is a Delaware corporation whose principal place of business is

Seattle, Washington.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction under 28 U.S.C. § 1331, as this action arises under the

laws of the United States, specifically, under 18 U.S.C. § 1836 *et seq.*, the federal Defend Trade

Secrets Act of 2016 ("DTSA").  The remaining claims asserted by DAT against Convoy are within

the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because they arise from the

same nucleus of operative facts as the claim arising under the DTSA.

13.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because (i) a

substantial part of the events or omissions giving rise to the claims asserted occurred in this district

and (ii) DAT and Convoy have agreed by contract to have this dispute resolved in Oregon federal

courts.  *See* Exhibit 1, National Account Agreement at § 22 ("The parties hereto agree that any

PAGE 5 – COMPLAINT

action arising out of or relating to this Agreement shall be litigated solely in the state and federal courts located in Multnomah County, Oregon[.]").

14.     This Court has personal jurisdiction over Convoy because Convoy expressly agreed that "any action arising out of or relating to this Agreement shall be litigated solely in the state and federal courts located in Multnomah County, Oregon[.]"  *See id.*

## FACTUAL BACKGROUND

**A.     DAT grows from a truck stop in Portland to become the most recognized, most sophisticated freight marketplace in America.**

15.     DAT was founded as "Dial-A-Truck" in 1978 by two brothers, Al and Fred Jubitz, who owned truck stops in Portland, Oregon.  The truck stops provided various services to long-haul and interstate truck drivers—food, showers, temporary lodgings, and other services and accommodations.  The Jubitz Brothers noticed that truckers frequenting their truck stops were often looking to get hired for new jobs transporting freight.

16.     Dial-A-Truck began offering a service to match these truckers with entities looking to have freight shipped from one point to another.  The service began as a bulletin board posted inside the truck stops, and—as demand for the service skyrocketed—quickly grew into a comprehensive, nationwide freight network powered by sophisticated, proprietary technology and information.  Shortly after the service originated in Portland in 1978, nine other truck stops along the Interstate 5 corridor (from Washington to California) added Dial-A-Truck television monitors inside their stops.  By 1985, Dial-A-Truck monitors had been installed inside more than 200 truck stops in 42 states.  In 1989, Dial-A-Truck became "DAT Services" and had monitors in more than 500 truck stops across the United States.

PAGE 6 – COMPLAINT

17.    With substantial investments of time and money, DAT continued to innovate and grow its load board technology thereafter.  For example, in 1995, DAT introduced its "Transportation Terminal," becoming the first North American freight-matching service to provide real-time data to interested parties, which was transmitted through satellite technology. Subscribers were provided with a desktop terminal and a roof-top mounted satellite dish to receive real-time data showing loads that were available for shipping.  In 1997, DAT introduced "DAT Connect" for Windows—an interactive software program that allowed users to access the DAT load board from a personal computer via modem.  By 2001, customers could access the DAT load board by internet, fax, telephone, mail, or through the monitors located inside truck stops—of which there were approximately 1200.

18.    Today, DAT maintains and operates the most recognized load board in North America.  DAT has over 138,000 customers in the United States.  The DAT load board can be easily accessed through an app on customers' mobile devices, or through more traditional means. Nearly 900,000 loads of freight are posted to the DAT load board each business day, and since its inception in 1978, the DAT load board has been used by market participants to consummate approximately $110 billion in market transactions.

19.    Freight matching—connecting carriers and shippers—is one of the primary services provided by DAT to its customers.  DAT, however, provides another very valuable service to its customers by giving them access to DAT Solution's unique and proprietary collection of historical and real-time pricing data, route information, and other information that is enormously valuable to market participants in its own right.

PAGE 7 – COMPLAINT

20.    For example, since 2009, DAT has offered a product called "Rate View" that, through a proprietary and trade secret algorithmic process, generates a benchmark rate for shipping a load of freight from one specific geographic point to another (called a "lane").

21.    This benchmark rate is generated by DAT using both historical and real-time data available to DAT (and only DAT) by virtue of its decades-long maintenance of America's most recognized freight market, and its proprietary methods for the aggregation and analysis of hundreds of millions of potential and actual shipping transactions.  On any given day, in any given year, the shipping rate on any given "lane" can vary based on a multitude of factors—the weather, fuel prices, historical lane pricing, trucker supply and demand, freight supply and demand, various supply chain issues, and other factors that influence the price to ship freight.  Using the hundreds of thousands of freight transactions that have been consummated through the DAT load board each day, Rate View provides a unique solution that calculates and generates a real-time "benchmark" rate for shipping freight from one point to another.  Rate View provides these benchmark rates for over 68,000 unique lanes across North America, and can provide rates on a 3, 7, 15, 30, or 90-day average.

22.    To generate this benchmark rate, DAT uses proprietary methods to "clean" and analyze the underlying data to ensure that the benchmark rate is as accurate as possible.  Among other things, in cleaning and analyzing the data, DAT (i) eliminates outlier rates that are multiple standard deviations from the mean, (ii) anonymizes the data so that the positions of any particular customers are not disclosed, and (iii) ensures that there is a data set for each lane that is sufficient to generate a reliable benchmark.

PAGE 8 – COMPLAINT

23.     This benchmark rate, and other proprietary pricing and shipping data and information, is available to customers through the DAT network.

**B.     Convoy and DAT enter into a contract that allows Convoy to use the DAT load board for brokerage services, but prohibits Convoy from creating a competing load board.**

24.     Defendant Convoy was founded in 2015, in Seattle, Washington.  It is run by individuals with experience in the tech industry (not the trucking industry), and is primarily backed by various private equity and venture capital funds.

25.     Convoy began as a freight "broker."  Brokers, like Convoy, are hired by third parties that need large volumes of freight to be shipped to and from various geographic points. These third parties have freight that needs to be shipped, but generally do not maintain their own fleet of trucks to ship the freight.  Instead, these third parties hire freight brokers to arrange shipping for their freight.  For a fee, the brokers become the "carriers of record" of the freight and arrange to have it shipped from the point of origin to the point of destination.

26.     For example, a manufacturing company in Portland may need to ship its goods from Portland to Los Angeles.  If the manufacturer does not maintain its own fleet of trucks, the manufacturer can, for a fee, hire a broker like Convoy to find truckers to transport the goods from Portland to Los Angeles.  Convoy then finds the trucks, becomes the carrier of record for the goods, and ensures that the goods are shipped from Portland to Los Angeles (or any other shipping "lane" in the country).

27.     The DAT load board is an invaluable tool for brokers like Convoy; they rely upon the DAT load board to find truckers and carriers to move their clients' freight, and rely on Rate View to ensure competitive pricing for their customers.  By category, brokers are the largest

PAGE 9 – COMPLAINT

customers and users of the DAT load board. Once engaged by a third party to ship freight, brokers

post the freight to the DAT load board to find carriers that can transport the freight. Brokers also

rely upon the DAT Rate View product and similar analytical tools and data on the DAT load board

to identify and set prices for shipping freight from one point to another.

28.     In 2016, within a year of its founding, Convoy entered into a National Account

Agreement with DAT, which authorized Convoy to access the DAT load board only for certain

limited purposes. The National Account Agreement was amended effective November 7, 2018,

and a copy of the agreement (as amended) is attached as Exhibit 1. The National Account

Agreement was signed by Convoy's Chief Financial Officer, Brian Kreiner.

29.     The purpose of the National Account Agreement was to allow Convoy, in its

capacity as a freight broker, to post freight to the DAT load board, and to access other data or

information that could be used by Convoy to perform freight brokerage services for its own

brokerage customers. Section 3(A) of the National Account Agreement stated that Convoy's

"appropriate use" of the DAT Solution load board was restricted to its capacity as a "freight

broker."

30.     The National Account Agreement, and other related documents executed by the

parties contemporaneously with the National Account Agreement, <u>expressly forbade</u> Convoy from

creating a competing load board. Specifically, Section 4 of the National Account Agreement

states, in relevant part:

>    **Non-Compete as a Load Board:** Customer [Convoy] represents
>    and warrants that its use of DAT's Products: (a) is solely for
>    Customer's commercial purposes related to its movement of freight
>    and that Customer shall not reproduce, republish, resell, or distribute
>    such information in any format, in whole or in part, for sale or
>    commercial use by third parties. During the Term, **customer may**

PAGE 10 – COMPLAINT

> **not create a load board wherein they aggregate other brokers'
> loads with the intent of competing with DAT**. . . . If DAT deems
> Customer's activity or use of the Products to be detrimental to the
> DAT network[,] DAT reserves the right, at their sole discretion, to
> immediately suspend service and may terminate this agreement
> upon 30 days' notice.

Exhibit 1 at § 4 (emphasis added).

31.     Similarly, Section 13 of the National Account Agreement states, in relevant part:

> **Copyright/Trademarks/Advertisements**:  Information  provided
> by DAT is proprietary to DAT.  Customer may not sell or share DAT
> load and truck information with third parties.  Customer agrees to
> use the information provided by DAT solely for its own internal
> business purposes, and shall not reproduce, publish, resell or
> distribute such information for sale or commercial use.  Customer's
> use of DAT Products does not grant to the Customer ownership of
> any content, code, data or materials Customer may access through
> these Products.

*Id.* at § 13.

32.     At the same time, DAT and Convoy entered into a Data Analytics Services
Addendum, also dated November 7, 2018, which by its terms was "incorporated and made a part"
of the National Account Agreement.  Like the other documents, this Addendum stated that the
information and data maintained on the DAT network was proprietary and confidential, and could
be used by Convoy only for certain express purposes.  Specifically, Section 3 of the Data Analytics
Services Addendum states, in relevant part:

> **Proper Use and Confidentiality:** Customer will be licensed to
> utilize its updated master file database, without restriction, once the
> Services are delivered by DAT, with the understanding that the data
> provided <u>is from proprietary sources</u> and may be utilized for
> <u>Customer's internal purposes only</u>.
>
> Customer shall treat all rate or market information provided by DAT
> as confidential.  <u>Customer will not use DAT rate information or
> other proprietary product information to develop a competitive lane</u>

PAGE 11 – COMPLAINT

<u>rate product, invest in direct competitors</u>, or competitive start ups, or provide DAT rate or product/service information to any company considered by DAT to be a competitor. . .  Customer may not replicate/resell data or files structures received from DAT. Confidentiality requirements shall survive termination of any/all agreements/addendums.

Exhibit 2 at § 3 (emphasis supplied).

33.    DAT and Convoy also entered into a "DAT Connexion Interface End User License," dated November 7, 2018.  Section (II)(6) of the License states:

**Non-Competition**: Company [Convoy] **<u>shall not</u>** use the Interface or Software to:

(a)  **<u>Create any competing load board or freight matching services to brokers, truckers or shippers.</u>**

(b) "Double-broker" freight or trucks.  Brokers shall use Interface only to offer loads to carriers or trucks to shippers; and/or

(c) Transfer data to any other load board or freight matching service provider.

Exhibit 3 (emphasis added).

34.    The explicit and implicit effect of these provisions is clear: Convoy was granted limited access to the DAT network to (i) post the freight of its brokerage clients and locate carriers to haul that freight, and (ii) access data and information to be used by Convoy in providing freight brokerage services to its clients.  Convoy was expressly **<u>not</u>** permitted to (i) create a competing load board, on which freight could be posted for purposes of matching shippers and carriers; (ii) use DAT data and information to create or maintain a competing load board at any time, prior to or after the term of the National Account Agreement; and (iii) otherwise use DAT's proprietary data and information to create a product or freight marketplace in direct competition with DAT.

PAGE 12 – COMPLAINT

C.    **Convoy intentionally breaches the non-compete provisions and willfully and maliciously misappropriates DAT's data and trade secrets.**

35.    On or around October 29, 2021, DAT first learned that Convoy was in the process of creating a load board that would directly compete with DAT's own load board.

36.    Thereafter, DAT contacted the Chief Executive Officer of Convoy, Dan Lewis, by telephone.  DAT asked Mr. Lewis point-blank whether Convoy was in fact creating a competing load board, in contravention of the contracts between the parties.  Mr. Lewis denied that Convoy was creating a competing load board, telling DAT that Convoy was instead simply "spitballing" and "innovating" with potential new products.  Eventually, however, as noted below, Convoy admitted that it was, in fact, creating its own load board that would directly compete with DAT.

37.    On November 6, 2021, shortly after confirming that Convoy had created a competing load board, DAT declined to renew Convoy's access to the DAT load board.

38.    Less than two weeks later, on November 18, 2021, Convoy publicly announced via press release and social media postings that it had created a new competing load board (or "digital freight network") called "Convoy for Brokers."

39.    Specifically, in a press release dated November 18, 2021, Convoy announced:

> **Convoy Opens Up Digital Freight Network to Truckload Brokerages**
>
> SEATTLE, WA-November 18, 2021—Convoy . . . today rolled out a new program that provides freight brokers with direct access to Convoy's network of owner-operators and small carriers, numbering more than 300,000 trucks.  *Convoy for Brokers* enables brokerages to quickly find high-quality capacity while maintaining their relationships with carriers and the privacy of their data. . . . . Industry-leading freight providers, including USA Truck and AFS Logistics, are now using the new program to tap into Convoy's elastic capacity and expand their carrier bases.

PAGE 13 – COMPLAINT

…

With today's announcement, Convoy is opening up its digital freight network, enabling brokers to access its fleet of carriers and improve productivity through brokerage automation.

…

As part of Convoy's ongoing commitment to helping drivers earn more with less hassle, today's launch of Convoy for Brokers benefits the tens of thousands of carriers and owner-operators that have joined the digital freight network.

...

Starting today, Convoy for Brokers is available to freight brokerages nationwide.

A copy of the press release is attached to this Complaint as Exhibit 4.

40.    In the press release, **Convoy's Vice President of Partnerships**, Brooks McMahon,

**admitted that Convoy had been building its competing load board for at least one year**. Mr.

McMahon further admitted that Convoy had been working with an existing customer of DAT,

USA Truck, to build its competing load board:

"Today's announcement is the result of **more than a year** of hard work, including a tight collaboration between Convoy and the forward-thinking team at USA Truck," said Brooks McMahon, VP of Partnerships at Convoy. "Our partnership with USA Truck has been integral to the evolution of this new offering, and it's led to an acceleration of the program and collaboration with other partners like AFS Logistics. Our work together **over the last year** exemplifies how freight industry collaboration can benefit all parties—carriers, shippers, and brokers."

Exhibit 4 (emphasis added). In the same press release, an officer of USA Truck confirmed that it

had been posting freight to Convoy's competing load board during the course of the prior year,

stating that Convoy for Brokers had "helped us support additional growth in our load volume and

PAGE 14 – COMPLAINT

increase the productivity of our team by making it easier to access trucks through Convoy's digital freight network." *Id.*

41.     Mr. McMahon, and Madhu Dutta—Convoy's Director of Engineering—made similar admissions in a blog post dated the same day as the press release, November 18, 2021. Among other things, they admitted that they had "piloted" the competing load board well before November 18, 2021, and that Convoy had created its competing load board with one of DAT's existing customers, USA Truck.  In that blog post, Messrs. McMahon and Dutta wrote:

> Today we're excited to announce the next step in Convoy's growth and evolution as the nation's leading digital freight network. . . . [T]hrough discussions with the forward-thinking team at USA Truck, **we began work just over a year ago** on a new technology solution for brokers that could address their needs for efficiency and quality.  Over the last year, we've piloted the solution with USA Truck and many other freight providers.  Today, we're making the solution available to brokers nationwide.

A copy of this blog post is attached to the Complaint as Exhibit 5 (emphasis added).

42.     Also on November 18, 2021, Convoy's Chief Marketplace Officer, Ryan Gavin, posted a video message to Twitter, in which he acknowledged that "Convoy for Brokers" was in fact a "freight network . . . Brokerages nationwide can now post your loads to our network."

43.     In short, in announcing its new freight network, Convoy admitted that it breached its contract with DAT by spending at least a year setting up a competing load board behind DAT's back, all while masquerading as a broker to get access to DAT's proprietary and trade secret information.

44.     The press release and social media postings also included an image of the new "Convoy for Brokers" load board, pictured below:

PAGE 15 – COMPLAINT



45.     The interface looked very much like DAT's existing digital load board, and contained much of the data and information included on the DAT load board, pictured below:



46.     Additionally, the Convoy load board purports to use artificial intelligence—including automated, algorithmic pricing formulas—to promote efficiency and provide better service for its broker customers.  On information and belief, however, Convoy could not have built

PAGE 16 – COMPLAINT

(and did not build) its pricing algorithm, or otherwise create a functional load board, without using and misappropriating the proprietary data and trade secrets it was accessing for improper purposes on the DAT load board.

47.    Specifically, Convoy independently has no meaningful long-haul history, rate history, lane history, or other data that would be required to develop and operate an automated, algorithmic-driven digital load board like "Convoy for Brokers."  The only source from which Convoy could have obtained (and did obtain) the volume and quality of data and information needed to develop and launch its competing load board and/or its pricing algorithm is the DAT load board—which Convoy accessed under the guise of acting as a broker, but in actuality used to misappropriate proprietary data and trade secrets to launch a competing load board.  In short, "Convoy for Brokers" was built on lies as well as on the back of stolen data and trade secrets that DAT has been collecting, analyzing and synthesizing for decades.

48.    It is apparent that Convoy has used, and may continue to use, data it misappropriated from DAT to either further develop and refine its own algorithmic pricing formula, or to serve as an input in its own algorithmic pricing formula, used to operate its competing load board, "Convoy for Brokers."

## COUNT ONE

**Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act of 2016,**

**18 U.S.C. § 1836, *et seq*.**

49.    DAT incorporates all preceding paragraphs of the Complaint as if fully set forth here.

PAGE 17 – COMPLAINT

50.     As a result of the National Account Agreement between DAT and Convoy, Convoy was licensed to have limited access to DAT's trade secret information, proprietary data, and know-how. This trade secret information, proprietary data, and know-how included DAT's load board software and all data and information it contained, like historical and real-time pricing information, Rate View benchmark pricing, lane information, and other proprietary information owned by DAT. The National Account Agreement specifically identified this data and information as being "proprietary" in nature, and required that the data and information be kept "confidential" and only used by Convoy for limited, internal purposes.

51.     DAT has undertaken reasonable measures to safeguard and keep secret its trade secret information, including the load board software and information thereon, and its own proprietary pricing information, and to ensure that the information is used only for specifically-authorized purposes. Convoy was subject to the National Account Agreement that required it to maintain the confidentiality of the load board software and information thereon, and prohibited it from using and/or disclosing such information except for internal use in connection with its provision of freight brokerage services.

52.     The DAT load board, and the data and information accessible through the load board, derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

53.     DAT's load board, and the data and information accessible thereon, is used nationwide in interstate commerce.

PAGE 18 – COMPLAINT

54.     Convoy has used and/or disclosed, or inevitably will use and/or disclose, DAT's trade secret information, including the DAT load board and the proprietary data and information accessible thereon, for Convoy's benefit and advantage—specifically, to create a load board that directly competes with DAT.

55.     Convoy's conduct constitutes knowing, willful, and malicious misappropriation. Among other things, Convoy misused and misappropriated DAT's trade secrets for more than a year, during which time it surreptitiously created a competing load board while knowing that it was prohibited from doing so under the law and the terms of the parties' contract, and while masquerading as a broker.  During the more than one year in which it was secretly developing a competing load board, Convoy solicited at least one of DAT's existing customers to be a customer of Convoy.  Similarly, Convoy misappropriated and misused DAT's proprietary data and trade secrets to create its own load board and/or to develop and run its own algorithmic pricing formula—even though the National Account Agreement expressly forbade such use, and identified the data as "proprietary" to DAT.

56.     As a direct and proximate result of Convoy's wrongful conduct, DAT has been substantially and irreparably harmed in an amount to be determined at trial.  Unless restrained by this Court, Convoy will cause further irreparable injury to DAT by unlawfully competing with DAT.  DAT has also suffered direct and consequential damages, and is entitled to recover compensatory damages, exemplary damages, and other damages in an amount to be proven at trial. DAT is also entitled to its attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

PAGE 19 – COMPLAINT

## COUNT TWO

## Misappropriation of Trade Secrets Under Delaware's Uniform Trade Secrets Act

## ("DUTSA")

57.     DAT incorporates all preceding paragraphs of the Complaint as if fully set forth here.

58.     The National Account Agreement is governed by Delaware law.

59.     As a result of the National Account Agreement between DAT and Convoy, Convoy was provided access to DAT's trade secret information, proprietary data, and know-how. This included DAT's load board software and all data and information contained thereon, like historical and real-time pricing information, Rate View benchmark pricing, lane information, and other proprietary information owned by DAT. The National Account Agreement specifically identified this data and information as being "proprietary" in nature, and required that the data and information be kept "confidential" except for limited internal purposes.

60.     DAT has undertaken reasonable measures to safeguard and keep secret its trade secret information, including the load board software and information thereon, and its own proprietary pricing information, and to ensure that the information is being used only for specifically-authorized purposes. Convoy was subject to the National Account Agreement that required it to maintain the confidentiality of the load board software and information thereon, and prohibited it from using and/or disclosing such information except in connection with its provision of freight brokerage services.

61.     The DAT load board, and the data and information accessible through the load board, derives independent economic value, actual or potential, from not being generally known

PAGE 20 – COMPLAINT

to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

62.     Convoy unlawfully has used and/or disclosed, or inevitably will use and/or disclose, DAT's trade secret information, including the DAT load board and the data and information accessible thereon, for Convoy's benefit and advantage—specifically, to create a load board that directly competes with DAT.

63.     Convoy's conduct constitutes knowing, willful, and malicious misappropriation. Among other things, Convoy misused and misappropriated DAT's trade secrets for more than a year, during which time it surreptitiously created a competing load board while knowing that it was prohibited from doing so under the law and the terms of the parties' contract.  During the more than one year in which it was secretly developing a competing load board, Convoy solicited at least one of DAT's existing customers to be a customer of Convoy.  Similarly, Convoy misappropriated and misused DAT's proprietary data to create its own load board and/or to develop and run its own algorithmic pricing formula—even though the National Account Agreement expressly forbade such use, and identified the data as "proprietary" to DAT.

64.     As a direct and proximate result of Convoy's wrongful conduct, DAT has been substantially and irreparably harmed in an amount to be determined at trial.  Unless restrained by this Court, Convoy will cause further irreparable injury to DAT.  DAT has also suffered direct and consequential damages, and is entitled to recover compensatory damages, exemplary damages, and other damages in an amount to be proven at trial.  DAT is also entitled to its attorneys' fees pursuant to 6 Del. C. § 2004.

PAGE 21 – COMPLAINT

## COUNT THREE

### Breach of Contract

65.     DAT incorporates all preceding paragraphs of the Complaint as if fully set forth here.

66.     Convoy's actions, as set forth above, constitute a breach of the National Account Agreement (Exhibit 1), the Data Analytics Services Addendum (Exhibit 2), the DAT Connexion Interface End User License (Exhibit 3), and the National Account Review Service Addendum (Exhibit 6).

67.     Section 4 of the National Account Agreement states, in relevant part: "Customer represents and warrants that its use of DAT's Products: (a) is solely for Customer's commercial purposes related to its movement of freight and that Customer shall not reproduce, republish, resell or distribute such information in any format, in whole or in part, for sale or commercial use by third parties.  During the Term, customer may not create a load board wherein they aggregate other brokers' loads with the intent of competing with DAT."  Convoy breached this provision by, at a minimum, (i) creating a competing load board during the term of the National Account Agreement and (ii) using information and data from the DAT load board for the impermissible purpose of creating a competing load board.

68.     Convoy's actions also violated and continue to violate Section 13 of the National Account Agreement, which states in relevant part: "Information provided by DAT is proprietary to DAT.  Customer may not sell or share DAT load and truck information with third parties.  Customer agrees to use the information provided by DAT solely for its own internal business purposes, and shall not [sic] to reproduce, publish, resell or distribute such information for sale or

PAGE 22 – COMPLAINT

commercial use.  Customer's use of DAT Products does not grant to the Customer ownership of any content, code, data or materials Customer may access through these Products."  Convoy breached this provision by, at a minimum, using information and data from the DAT load board for the impermissible purposes of (i) creating a competing load board and (ii) developing and/or maintaining a pricing algorithm used within Convoy's competing load board.

69.     Convoy's actions also violated and continue to violate Section 3 of the Data Analytics Services Addendum: "Customer will be licensed to utilize its updated master file database, without restriction, once the Services are delivered by DAT, with the understanding that the data provided is from proprietary sources and may be utilized for Customer's internal purposes only. . . . Customer will not use DAT rate information or other proprietary product information to develop a competitive lane rate product, invest in direct competitors or competitive start ups, or provide DAT rate or product/service information to any company considered by DAT to be a competitor.  Customer shall not attempt to mine or replicate the rate database in order to compete with DAT.  Customer may use bulk download capability for internal purposes.  Customer may not replicate/resell data or files structures received from DAT.  Confidentiality requirements shall survive termination of any/all agreements/addendums."  Convoy breached this provision by, at a minimum, (i) creating a competing load board and (ii) using information and data from the DAT load board for the impermissible purposes of (a) creating a competing load board and (b) creating and/or maintaining a pricing algorithm used within Convoy's competing load board.

70.     Convoy's actions also violate Paragraph 1 of the National Account Rateview Service Addendum, attached as Exhibit 6, which states: "Customer must be exclusive with DAT and shall not contribute data to any other service which aggregates data for purposes of providing

PAGE 23 – COMPLAINT

trucking lane rates and is deemed a competitive service by DAT." Convoy breached this provision by creating a competing load board and contributing data to its competing load board in direct competition with DAT.

71.    In addition, Convoy's actions violated and continue to violate the DAT Connexion Interface End User License Sections:

- II(3)(a): "Company [Convoy] shall not sell, redistribute, sublicense, or otherwise disclose or transfer to any Third Party all or any portion of the Interface Data (except that Company may disclose the DAT Connexion Interface Data from a particular account to the owner of that account if Company is not the owner).";

- II(6): "Company shall not use the Interface or Software to: (a) Create any competing load board or freight matching services to brokers, truckers, or shippers. (b) 'Double-broker' freight or trucks. Brokers shall use Interface only to offer loads to carriers or trucks to shippers; and/or (c) Transfer data to any other load board or freight matching service provider."; and

- IV(4): "Other than expressly granted herein, this License does not grant either party any intellectual property or other proprietary rights. . . . As between Company and DAT, DAT and its applicable licensors retain all intellectual property rights (including all patent, trademark, copyright, and other proprietary rights) in and to the Specifications, all DAT websites and all DAT services and any derivative works created thereof."

Convoy breached these provisions by, at a minimum, (i) creating a competing load board on which it double-brokered freight from USA Truck and, potentially, other brokers; and (ii) using information and data from the DAT load board for the impermissible purposes of (a) creating a competing load board and (b) developing and/or maintaining a pricing algorithm used within Convoy's competing load board.

PAGE 24 – COMPLAINT

72.     DAT has performed its obligations under the National Account Agreement, the Data Analytics Services Addendum, the DAT Connexion Interface End User License, and the National Account Review Service Addendum.

73.     DAT has been damaged by Convoy's breach of the National Account Agreement, the Data Analytics Services Addendum, the DAT Connexion Interface End User License, and the National Account Review Service Addendum in an amount to be proven at trial.  DAT is also entitled to injunctive relief.  Pursuant to Section 22 of the National Account Agreement, DAT is also entitled to its attorneys' fees and costs.

## COUNT FOUR

### Unjust Enrichment

74.     DAT incorporates all preceding paragraphs of the Complaint as if fully set forth herein.

75.     Per the terms of the parties' agreements, Convoy was entitled to access the DAT load board, and the data and information thereon, solely for purposes of Convoy's freight brokerage business.  In return for this limited permitted access, Convoy paid a regular service fee to DAT.

76.     Convoy impermissibly used the DAT load board and the data and information it contains to, among other things, create a competing load board and promote and develop its own pricing algorithm.  Convoy did not pay or otherwise provide compensation to DAT for this impermissible use of DAT's data and services.  Convoy has thus been unjustly enriched by obtaining a benefit from DAT without appropriately compensating DAT for the benefit conferred.

PAGE 25 – COMPLAINT

77.     DAT is entitled to be compensated for the extra-contractual benefits conferred upon Convoy in an amount to be determined at trial.  Pursuant to Section 22 of the National Account Agreement, DAT is also entitled to its attorneys' fees and costs.

**COUNT FIVE**

**Unfair Competition**

78.     DAT incorporates all preceding paragraphs of the Complaint as if fully set forth here.

79.     DAT reasonably expected that it would have a business relationship with carriers, shippers, brokers, and other freight market participants that use, have used, or would in the future use the DAT load board.  This reasonable expectation includes, but is not limited to, DAT's relationship with its customer USA Truck, and other customers that Convoy has solicited or is soliciting to post freight to "Convoy for Brokers."

80.     Convoy wrongfully interfered with these relationships by (i) intentionally creating and operating a competing load board that has taken and/or will take customers, or their specific freight postings, away from DAT; and/or (ii) misappropriating DAT's proprietary data and trade secrets in an intentional effort to take customers or freight postings away from DAT.

81.     As a direct and proximate result of Convoy's wrongful conduct, DAT has been and/or will be substantially and irreparably harmed in an amount to be determined at trial.  Unless restrained by this Court, Convoy will cause further irreparable injury to DAT.  DAT has also suffered direct and consequential damages, and is entitled to recover compensatory damages in an amount to be proven at trial.  Pursuant to Section 22 of the National Account Agreement, DAT is also entitled to its attorneys' fees and costs.

PAGE 26 – COMPLAINT

**COUNT SIX**

**Tortious Interference with Prospective Business Opportunities**

82.     DAT incorporates all preceding paragraphs of the Complaint as if fully set forth here.

83.     DAT had a reasonable probability of a business opportunity with carriers, shippers, brokers, and other freight market participants that use, have used, or would in the future use the DAT load board.  This reasonable probability includes, but is not limited to, DAT's opportunities with its customer USA Truck, and other customers that Convoy has solicited or is soliciting to post freight to "Convoy for Brokers."

84.     Convoy intentionally interfered with DAT's business opportunities by (i) intentionally creating and operating a competing load board that has taken and/or will take opportunities (including customers and specific freight postings) away from DAT; and/or (ii) misappropriating DAT's proprietary data and trade secrets in an intentional effort to take customers or freight postings away from DAT.

85.     As a direct and proximate result of Convoy's wrongful conduct, DAT has been substantially and irreparably harmed in an amount to be determined at trial.  Unless restrained by this Court, Convoy will cause further irreparable injury to DAT.  DAT has also suffered direct and consequential damages, and is entitled to recover compensatory damages in an amount to be proven at trial.  Pursuant to Section 22 of the National Account Agreement, DAT is also entitled to its attorneys' fees and costs.

**Buckley Law P.C.**
5300 Meadows Road, Suite 200
Lake Oswego, Oregon 97035
Tel: 503-620-8900 | Fax: 503-620-4878

## PRAYER FOR RELIEF

**WHEREFORE** DAT prays as follows:

1.      That the Court award DAT injunctive relief in the form of specifically enforcing the National Account Agreement to the fullest extent allowed by law, including by shutting down and dismantling Convoy's competing load board, "Convoy for Brokers";

2.      That Convoy be enjoined from using, divulging, disclosing, revealing, or communicating information regarding DAT's products, and enjoined from operating its competing load board, "Convoy for Brokers";

3.      That Convoy be enjoined from actual or threatened misappropriation of trade secrets;

4.      That Convoy be enjoined from further tortiously interfering with DAT's current or prospective business opportunities;

5.      That DAT be awarded damages for any loss occasioned by breaches of contract, misappropriation of trade secrets, and other tortious conduct;

6.      That DAT be awarded punitive or exemplary damages for Convoy's willful and malicious misappropriation of trade secrets;

7.      That DAT be awarded its attorneys' fees, costs and disbursements in this action;

8.      That DAT be awarded compensatory damages, for its unfair competition and tortious interference with prospective business opportunities claims; and

9.      That DAT be awarded such other and further relief in its favor as the Court deems appropriate.

PAGE 28 – COMPLAINT

## JURY DEMAND

DAT Solutions, LLC hereby requests a trial by jury on all issues so triable.


DATED this 19th day of January 2022.

BUCKLEY LAW P.C.

By: _____/s/ Marjorie A. Elken_____
     Marjorie A. Elken, OSB No. 073368
     MAE@buckley-law.com
     5300 Meadows Road, Suite 200
     Lake Oswego, OR  97035
     Telephone: +1 503 620 8900
     Facsimile: +1 503 620 4878

     Damond R. Mace (*pro hac vice* to be filed)
     Sean L. McGrane (*pro hac vice* to be filed)
     Marissa Black (*pro hac vice* to be filed)
     damond.mace@squirepb.com
     sean.mcgrane@squirepb.com
     marissa.black@squirepb.com
     SQUIRE PATTON BOGGS (US) LLP
     4900 Key Tower
     127 Public Square
     Cleveland, Ohio  44114
     Telephone: +1 216 479 8500
     Facsimile: +1 216 479 8780

     *Attorneys for Plaintiff DAT Solutions, LLC*

PAGE 29 – COMPLAINT