Per A. Ramfjord, OSB No. 934024
per.ramfjord@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

Amy Candido (*pro hac vice*)
acandido@wsgr.com
Charles Tait Graves (*pro hac vice*)
tgraves@wsgr.com
Jordan Jaffe (*pro hac vice*)
jjaffe@wsgr.com
Justina Sessions (*pro hac vice forthcoming*)
jsessions@wsgr.com
WILSON SONSINI GOODRICH & ROSATI, P.C.
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Facsimile: (415) 947-2099

*Attorneys for Convoy, Inc.*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DAT SOLUTIONS, LLC, | Case No.: 3:22-cv-00088-IM |
| Plaintiff/Counterdefendant, | **PARTIAL ANSWER TO COMPLAINT; COUNTERCLAIMS FOR ILLEGAL CONTRACTS IN RESTRAINT OF TRADE; MONOPOLIZATION; AND ATTEMPTED MONOPOLIZATION IN VIOLATION OF FEDERAL AND OREGON LAW** |
| v. | |
| CONVOY, INC., | |
| Defendant/Counterclaimant. | |
| | DEMAND FOR JURY TRIAL |

Pursuant to Rule 12 of the Federal Rules of Civil Procedure, Defendant Convoy, Inc. ("Convoy") hereby responds to Count 3 (for breach of contract) of Plaintiff DAT Solutions, LLC's ("DAT") Complaint, which is not the subject of Convoy's pending motion to dismiss as to Counts 1-2 and 4-6 (Convoy will respond to those claims, if necessary, in a timely fashion after the Court rules on its motion to dismiss).  *See* Dkt. 26.  All allegations in the Complaint are denied unless expressly admitted.  Convoy also asserts Counterclaims below against DAT pursuant to Federal Rule of Civil Procedure 13.

## PARTIAL ANSWER AS TO COUNT THREE (BREACH OF CONTRACT)

## NATURE OF THE CASE

1.      Convoy admits that, as a general matter, a freight market allows long-haul truckers and other carriers of freight to connect with entities that need to have freight shipped from one point to another.  Convoy admits that some, but not all, freight markets are commonly referred to as "load boards."  Convoy further admits that DAT maintains the most recognized and market-dominant load board in North America.  Convoy does not have sufficient knowledge to admit or deny the remaining allegations of this paragraph and on that basis denies them.

2.      Convoy admits that DAT operates a market-dominant load board that contains loads and other information that can only be found through its load board.  Convoy does not have sufficient knowledge to admit or deny the remaining allegations of this paragraph and on that basis denies them.

3.      Convoy admits that it is a private equity-backed company that was founded in Seattle, Washington in 2015.  Convoy denies the remaining allegations of this paragraph.

4.      Convoy admits that it entered into a contract with DAT in 2016 concerning Convoy's access to DAT's load board, which speaks for itself.  Convoy denies the remaining

allegations of this paragraph, as they purport to characterize the legal effect of the contract without its full context.

5.  Denied.

6.  Convoy admits that the contract referenced in this paragraph, which speaks for itself, contains a paragraph concerning "non-compete as a load board" and other provisions concerning the use of purportedly confidential information.  Convoy denies the remaining allegations of this paragraph.

7.  Convoy admits that this paragraph cites to a Convoy press release, which speaks for itself.  Convoy denies the remaining allegations of this paragraph.

8.  Denied.

9.  This paragraph contains legal argument and describes the relief that DAT seeks in this action, to which no response is required.  To the extent a response is required, Convoy denies the allegations of this paragraph.

## PARTIES

10.  Convoy does not have sufficient knowledge to admit or deny the allegations of this paragraph and on that basis denies them.

11.  Admitted.

## JURISDICTION AND VENUE

12.  Convoy does not contest the Court's subject matter jurisdiction in this case.

13.  Convoy does not contest that venue is proper in this District.

14.  Convoy does not contest that it is subject to personal jurisdiction in this Court.

## FACTUAL BACKGROUND

15.     Convoy does not have sufficient knowledge to admit or deny the allegations of this paragraph and on that basis denies them.

16.     Convoy does not have sufficient knowledge to admit or deny the allegations of this paragraph and on that basis denies them.

17.     Convoy does not have sufficient knowledge to admit or deny the allegations of this paragraph and on that basis denies them.

18.     Convoy admits that DAT maintains the most recognized and market-dominant load board in North America.  Convoy further admits that the DAT load board is easily accessible.  Convoy does not have sufficient knowledge to admit or deny the remaining allegations of this paragraph and on that basis denies them.

19.     Convoy admits that DAT provides a market-dominant rate data service called "Rate View."  Convoy does not have sufficient knowledge to admit or deny the remaining allegations of this paragraph and on that basis denies them.

20.     Convoy admits that DAT provides a market-dominant rate data service called "Rate View."  Convoy does not have sufficient knowledge to admit or deny the remaining allegations of this paragraph and on that basis denies them.

21.     Convoy admits that DAT provides a market-dominant rate data service called "Rate View."  Convoy does not have sufficient knowledge to admit or deny the remaining allegations of this paragraph and on that basis denies them.

22.     Convoy does not have sufficient knowledge to admit or deny the allegations of this paragraph and on that basis denies them.

23.    Convoy admits that DAT's allegedly proprietary data and benchmark rate is widely available.  Convoy does not have sufficient knowledge to admit or deny the remaining allegations of this paragraph and on that basis denies them.

24.    Convoy admits that it was founded in 2015 in Seattle, Washington.  Convoy further admits that several of its executives have experience in the tech industry and that its investors primarily include growth equity investors and venture capital funds.  Convoy denies the remaining allegations of this paragraph.

25.    Convoy admits that it has operated, in part, as a freight broker in the course of its business.  Convoy admits that this paragraph provides a partial description of the kinds of services that freight brokers offer.  Convoy denies the remaining allegations of this paragraph.

26.    Convoy admits that this paragraph provides a partial description of the kinds of services that freight brokers offer.  Convoy denies the remaining allegations of this paragraph.

27.    Convoy admits that DAT provides a market-dominant load board and rate data service that truckers, brokers, and carriers rely upon in the business of moving freight in the spot shipping market, including (for brokers) to find truckers and carriers to move freight and to ensure competitive pricing for their clients.  Convoy does not have sufficient knowledge to admit or deny the remaining allegations of this paragraph and on that basis denies them.

28.    Convoy admits that it entered into a contract with DAT in 2016 concerning Convoy's access to DAT's load board, which speaks for itself.  Convoy further admits that it entered into an amended National Account Agreement in November 2018, which also speaks for itself, and that this agreement was signed by its then CFO Brian Kreiner.  Convoy denies the remaining allegations of this paragraph, as they purport to characterize the legal effect of the contract without its full context.

29.     This paragraph cites to provisions of the National Account Agreement, which speaks for itself.  Convoy denies the remaining allegations of this paragraph, as they purport to characterize the legal effect of the contract without its full context.

30.     This paragraph cites to a provision in the National Account Agreement, which speaks for itself.  Convoy denies any wrongdoing under this provision.

31.     This paragraph cites to a provision in the National Account Agreement, which speaks for itself.  Convoy denies any wrongdoing under this provision.

32.     Convoy admits that it entered into a Data Analytics Services Addendum with DAT, which speaks for itself.  This paragraph also cites to a provision of the Data Analytics Services Addendum, which speaks for itself.  Convoy denies any wrongdoing under this provision.  Convoy denies the remaining allegations of this paragraph, as they purport to characterize the legal effect of the contract without its full context.

33.     Convoy admits that it entered into a DAT Connexion Interface End User License with DAT, which speaks for itself.  This paragraph also cites to a provision in the License, which speaks for itself.  Convoy denies any wrongdoing under this provision.

34.     This paragraph purports to characterize the legal effect of provisions in the parties' various agreements, which speak for themselves.  Convoy denies any wrongdoing under these provisions or agreements.

35.     Convoy does not have sufficient knowledge to admit or deny the allegations of this paragraph and on that basis denies them.

36.     This paragraph is vague and ambiguous to the extent it alleges the contents of a conversation involving an unknown person at DAT at an unspecified date and time, and on that basis Convoy denies the allegations.  Convoy specifically denies that Dan Lewis made any

misrepresentations to DAT concerning Convoy's products or services. Convoy admits that Convoy for Brokers competes with DAT in a relevant market for spot freight matching services, but denies that Convoy for Brokers is a "load board" as that term is used in the parties' agreements.

37.    Convoy admits that DAT declined to renew Convoy's access to the DAT load board in early November 2021. Convoy denies the remaining allegations of this paragraph.

38.    Convoy admits that it announced Convoy for Brokers via press releases and social media postings on or around November 18, 2021. Convoy denies the remaining allegations of this paragraph.

39.    Convoy admits that this paragraph quotes from select portions of a November 18, 2021 Convoy press release, which speaks for itself.

40.    Convoy admits that this paragraph quotes from select portions of a November 18, 2021 Convoy press release, which speaks for itself. Convoy denies the remaining allegations of this paragraph, including DAT's characterization of the content of the press release.

41.    Convoy admits that this paragraph quotes from select portions of a November 18, 2021 Convoy blog post, which speaks for itself. Convoy denies the remaining allegations of this paragraph, including DAT's characterization of the contents of the blog post.

42.    Convoy admits that this paragraph quotes from select portions of a November 18, 2021 Convoy video message, which speaks for itself.

43.    Denied.

44.    Convoy admits that this paragraph contains a screenshot from Convoy for Brokers. Convoy denies the remaining allegations of this paragraph.

45.     Convoy admits that this paragraph contains a screenshot from DAT's digital load board.  Convoy denies the remaining allegations of this paragraph.

46.     Convoy admits that Convoy for Brokers uses artificial intelligence, including automated, algorithmic formulas, to promote efficiency and provide better service for its customers.  Convoy denies the remaining allegations of this paragraph, including that Convoy for Brokers uses a pricing algorithm, or that Convoy misappropriated any proprietary data or trade secrets from DAT's load board.

47.     Denied.

48.     Denied.

## CAUSES OF ACTION

### COUNT THREE
### (Breach of Contract)

65.     Convoy incorporates all preceding paragraphs as if fully set forth herein.

66.     Denied.

67.     Convoy admits that this paragraph quotes from select portions of the National Account Agreement, which speaks for itself.  Convoy denies the remaining allegations of this paragraph, including that it breached that agreement.

68.     Convoy admits that this paragraph quotes from select portions of the National Account Agreement, which speaks for itself.  Convoy denies the remaining allegations of this paragraph, including that it breached that agreement.

69.     Convoy admits that this paragraph quotes from select portions of the Data Analytics Services Addendum, which speaks for itself.  Convoy denies the remaining allegations of this paragraph, including that it breached that agreement.

70.    Convoy admits that this paragraph quotes from select portions of the National Account Rateview Service Addendum, which speaks for itself.  Convoy denies the remaining allegations of this paragraph, including that it breached that agreement.

71.    Convoy admits that this paragraph quotes from select portions of the DAT Connexion Interface End User License, which speaks for itself.  Convoy denies the remaining allegations of this paragraph, including that it breached that agreement.

72.    Denied.

73.    Denied.

## AFFIRMATIVE DEFENSES TO COUNT THREE (BREACH OF CONTRACT)

### FIRST DEFENSE

DAT's breach of contract claim is barred in whole or in part because it fails to state a claim upon which relief may be granted.

### SECOND DEFENSE

DAT's breach of contract claim is barred in whole or in part because the agreements and provisions upon which it relies constitute illegal restraints of trade in violation of 15 U.S.C. § 1 and Oregon Rev. Stat. 646.725, and are therefore void and unenforceable.

### THIRD DEFENSE

To the extent it were deemed an affirmative defense – and Convoy does not aver that it is, and instead avers that the matter is a traverse – Convoy did not breach the parties' agreements because it independently developed Convoy for Brokers without using any proprietary information belonging to DAT, and because Convoy did not, during the term of the National Account Agreement, create a load board that aggregates other brokers' loads with the intent of competing with DAT.

**FOURTH DEFENSE**

DAT's breach of contract claim is barred in whole or in part by the doctrine of laches, waiver, and estoppel because DAT knew that Convoy had built and operated its digital freight network during the term of the National Account Agreement and took no steps to object or stop Convoy from doing so.

**FIFTH DEFENSE**

DAT's breach of contract claim is barred in whole or in part by the equitable doctrine of unclean hands with respect to the rights and obligations under the parties' agreements.

**SIXTH DEFENSE**

DAT's breach of contract claim is barred in whole or in part because DAT failed to prevent or mitigate its damages, if any.

**SEVENTH DEFENSE**

Any claims made by DAT should be set off against monies due and owing to Convoy, including but not limited to all damages suffered by Convoy arising from DAT's unlawful conduct as alleged in Convoy's Counterclaims below.

**ADDITIONAL DEFENSES**

Convoy may have additional, as yet unidentified, defenses available to the breach of contract claim.  Convoy reserves the right to assert additional defenses that are revealed by Convoy's investigation of this action or through discovery.

Convoy also reserves the right to assert additional affirmative defenses with respect to Counts 1, 2, 4, 5, and/or 6 to the extent the Court does not grant Convoy's pending motion to dismiss those claims (Dkt. 26), including but not limited to a failure to state those claims, preemption by the Delaware UTSA, violation of Delaware's bootstrapping doctrine, failure to

comply with the applicable statute of limitations, or any of the defenses listed above as to DAT's breach of contract claim.

## PRAYER FOR RELIEF

As to DAT's Prayer for Relief, Convoy denies that DAT has suffered injury or damages and denies that DAT is entitled to any relief in this lawsuit.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Convoy demands a trial by jury on all triable issues contained in DAT's claims.

* * *

## COUNTERCLAIMS

Defendant/Counterclaimant Convoy, Inc. ("Convoy"), by and through its undersigned counsel, alleges the following Counterclaims against Plaintiff/Counterdefendant DAT Solutions, LLC ("DAT") pursuant to Federal Rule of Civil Procedure 13:

## NATURE OF THE ACTION

1.      Convoy brings these counterclaims for compensation and injunctive relief to restore competition in the market for services that help match carriers with brokers for spot freight shipments.  DAT has long dominated this market and has insulated itself from competition by using its monopoly power to literally prohibit it.

2.      DAT's load board, although antiquated in many ways, remains a must-have source of load matching services for carriers and brokers moving spot freight.  DAT boasts of its dominance.  DAT is the "largest truckload freight marketplace in North America"[1] with "more

---

[1] https://www.dat.com/.

listings than any other load board."[2]  DAT claims to have "3 times more trucks than any other

load board"[3] and that "millions of loads . . . are only on DAT."[4]

3.      A monopolist is rarely so brazen that it openly directs others not to compete.

DAT, however, is not bashful.  DAT writes into some of its contracts a provision completely

prohibiting its customers from competing with DAT.  DAT thus presents broker customers with

an untenable choice: either agree not to compete with DAT under any circumstances, or lose

access to DAT's load board and to the carriers that use DAT to source loads.

4.      These non-compete agreements are *per se* anticompetitive forced agreements to

allocate the market, and to allocate it all to DAT.

5.      DAT is now brandishing its blanket non-compete in an attempt to shut down one

of the more significant competitive threats to DAT's load board, Convoy for Brokers.  Convoy

uses technology to find smarter ways to connect shippers with carriers while solving some of the

toughest problems that result in waste in the freight industry.  Convoy for Brokers allows third-

party brokers to take advantage of Convoy's industry-changing digital freight network.  DAT

would prefer that never happens, and that brokers stay captive to DAT.

6.      DAT's maintenance and insulation of its monopoly does not stop at forcing

customers to agree to stay off its turf.  DAT also imposes exclusivity on customers, ensuring that

they agree to use DAT's load board and no other competing service.

7.      DAT's market-smothering non-competes and exclusive deals alone and in

combination prevent meaningful competition in the market for spot freight matching services.

---

[2] https://www.dat.com/solutions/what-is-a-load-board.
[3] https://forms.dat.com/brokers/find-trucks.
[4] https://www.dat.com/solutions/what-is-a-load-board.

8.      Convoy brings these antitrust counterclaims to restore its right to compete freely and to bring more competition to the market for the benefit of truckers, shippers, and brokers across the industry and, ultimately, for the consumers who rely on freight to fill their needs.

## THE PARTIES

9.      Plaintiff/Counterdefendant DAT Solutions, LLC is a Delaware limited liability company with its principal places of business in Beaverton, Oregon and Denver, Colorado.

10.     Defendant/Counterclaimant Convoy, Inc. is a Delaware corporation with its principal place of business in Seattle, Washington.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337, as these Counterclaims arise under the laws of the United States, specifically to prevent and seek redress for DAT's violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2. The remaining Counterclaims are within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts as Convoy's Counterclaims arising under federal law.

12.     This Court has personal jurisdiction over Counterdefendant DAT because (i) DAT maintains one of its principal places of business in Beaverton, Oregon; and (ii) DAT has engaged in anticompetitive behavior that has a direct, foreseeable, and intended effect of injuring the business or property of persons residing in and located throughout the United States, including in Oregon.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22 because (i) Counterdefendant DAT transacts business in this District and may be found in this

District; and (ii) a substantial part of the events giving rise to these Counterclaims occurred and are occurring in this District.

14.    Jurisdiction and venue are also proper in this Court because these Counterclaims arise in part out of the same transactions and occurrences that are the subject matter of DAT's Complaint against Convoy in this action, in which DAT alleges that jurisdiction and venue are proper in this Court.

15.    DAT's actions were within the flow of, were intended to have, and did have a substantial effect on the interstate commerce of the United States.

## FACTUAL ALLEGATIONS

### I.    Background

16.    A large portion of the freight shipped in the United States is moved by truck at some point.  In the trucking industry, a *shipper* is a party that wants to transport freight.  A motor *carrier* is the party that actually does the transporting, operating or driving the trucks that carry the freight.  Motor carriers are regulated by the Federal Motor Carrier Safety Administration and must have authority to operate as carriers.

17.    The vast majority of truck freight transported in the United States is considered full truckload freight, where a shipper secures the services of a truck to move a single shipment from point A to point B.

18.    Many shippers access transportation capacity through an intermediary called a *broker*.  A broker arranges transportation on the shipper's behalf, finds the carrier and often negotiates the rate.  Freight brokers are regulated by the Federal Motor Carrier Safety Administration and must have authority to operate as brokers.

19.     Much of the truck freight transported in the United States is shipped under contracts.  For contract freight, a shipper and broker (or carrier) will agree to a long-term rate or pricing structure (often a year) for a forecasted volume of a given type of freight on a given route or "lane."  Then, when the shipper has a specific load to be transported, the shipper will tender it to the contracted broker(s) (or carrier).  Shippers also may work directly with asset-based carriers for some of their shipping needs.  Asset carriers use their own fleet of trucks to transport freight, but are limited by their fixed capacity and may only service certain regions or lanes.

20.     Many shipments are not, however, covered by existing contractual arrangements.  For these and other shipments, shippers may look to move loads under close-to-real-time spot, or transactional, rates for freight.  Shippers and brokers use spot rates for a variety of reasons.  A shipper may decide to use a mixture of contract and spot freight because inconsistent volume needs might make spot market rates more appealing.  In addition, emergency or expedited shipments may not be covered by an existing contract.  In certain circumstances, a contracted carrier may also reject a tendered load—for example, if the carrier does not have the necessary capacity at the time of the shipment necessitating use of the spot market.

21.     These one-off shipments are arranged in the spot market, where the parties agree to a rate and terms that apply to just that shipment.  Spot freight rates are influenced by the market conditions at or around the time of the quote and can vary significantly even within a day, whereas contract rates generally do not fluctuate throughout the contract term other than for ancillary costs such as fuel surcharges and lumper (loading and unloading-related) services costs.  DAT itself distinguishes the spot and contract freight markets, including by reporting on the

difference or spread between spot market rates and contract rates.[5]  Historically, between approximately 10% to 35% of U.S. truck freight has been moved in the spot market.[6]

22.    Most shippers typically access the spot market through brokers.  Brokers may also use the spot, or transactional, market to find carriers to move loads that are covered by a broker's contract with a shipper.  Thus, a load may be contracted to a broker but spot with respect to a carrier.

23.    Finding available carriers, vetting carriers, obtaining quotes, and arranging other logistics for spot freight shipments was traditionally a manual and time-consuming process. Brokers might have to call carriers one by one to inquire about spot capacity, and often relied on personal relationships with carriers.  On the other side, carriers—particularly individual owner-operators (i.e., a single driver that owns and operates one truck) and small carriers—struggled to fill all of their capacity, especially on return trips, also referred to as backhauls.

24.    Several services emerged to help facilitate matching supply and demand in the freight spot market.  Three such services are relevant to these Counterclaims.

25.    One, services emerged that helped to match spot shipments from shippers (or brokers working on their behalf) with carriers who were looking for loads.  DAT claims to have started the first "load board," which it describes as a bulletin board posted in a truck stop.  That bulletin board turned into a TV screen and then a computer screen.  Today, carriers, shippers, and brokers can use DAT's load board to post and check for listings seeking spot freight

---

[5] https://www.dat.com/blog/post/spot-premium-ratio-hits-2-year-high-what-does-that-mean-for-contract-rates.
[6] *E.g.*, https://www.dat.com/blog/post/spot-market-continues-to-grow-as-a-percentage-of-total-freight; https://www.freightwaves.com/news/askwaves-what-is-a-trucking-spot-rate-what-is-a-trucking-contract-rate#:~:text=The%20spot%20market%20is%20a,third%20of%20the%20total%20market; https://caplice.mit.edu/wp-content/uploads/2021/11/jscm_reducing_uncertainty_in_transportation_procurement_aug_2021.pdf.

shipments or capacity.  While DAT's service is not the most advanced or efficient, DAT's load board product is nonetheless market-dominant.

26.    DAT charges subscription fees to both carriers and brokers to access its load board.[7]

27.    <u>Two</u>, companies also began providing data to help price transactions.  One example is DAT's RateView product.  RateView aggregates data, including rates, from historical transactions.  DAT advertises that the RateView product provides spot market and contract rates, load-to-truck ratios in various regions, and average fuel surcharges and other information.  According to DAT, its "[s]pot market rates are compiled from $57 billion in actual transactions, updated daily."[8]

28.    <u>Three</u>, digital freight brokerages like Convoy emerged.  Convoy developed a first of its kind digital freight network to make it easier for various parties to effectively and efficiently match available loads with available capacity.  Initially Convoy helped match loads from shippers with trucks from carriers.  Later, Convoy introduced a service that allows third-party brokers to also match loads with carriers in Convoy's network.

29.    Traditional freight brokerages operate by hiring individuals who manually match loads to trucks.  This manual process is time-consuming and inefficient.  It often involves hours of back-and-forth emails and phone calls with multiple carriers.  In addition, most carriers see only a fraction of all available loads at any given time.  Loads are often available only to a select few carriers who can afford to fund and manage the drivers and tractor trailer fleets required for such operations.  Brokers also may operate with limited information about the safety and

---

[7] https://www.dat.com/load-boards.
[8] https://services.dat.com/content/resources/product-sheets/rateview-for-brokers.

performance of the carrier base that they are working with. Brokers traditionally make a spread between the buy and the sell for each load and are incentivized to maximize what the shipper pays and minimize what the driver makes.

30.    Convoy's digital freight network cuts out these inefficiencies. Convoy automates the matching and pricing processes, relying on data and machine learning rather than individual phone calls. Convoy also uses proprietary technology and processes to batch and combine shipments, cutting the number of empty miles that in-network carriers drive.

31.    Convoy's digital freight network is not open to everyone: Convoy relies on a network of heavily pre-vetted carriers and Convoy acts as the broker connecting those individually vetted carriers with Convoy's shipper clients.

32.    In 2021, Convoy opened its digital freight network to other truckload brokerages—establishing a new model for how brokers and digital freight networks can work together for the betterment of carriers, shippers, and the environment. This new program, called Convoy for Brokers, allows third-party brokers to post loads directly to Convoy's digital freight network and allows those brokers to take advantage of Convoy's industry leading data-driven processes and network of highly qualified carriers.

33.    Convoy was a DAT customer until DAT terminated Convoy's access to DAT's load board. Before that, Convoy used DAT's load board to find carrier capacity outside of Convoy's network and also subscribed to DAT's RateView service as well as other DAT data products. It was only after Convoy opened its digital freight network to other brokers that DAT decided to cut off Convoy from DAT's load board and sued to enforce what DAT perceived to be an agreement to stay out of DAT's market.

## II.    The Relevant Market and DAT's Power

### A.    Spot Freight Matching Services in the United States is a Relevant Antitrust Market

34.    DAT has monopoly power in, or in the alternative is attempting to monopolize, the market for spot freight matching services.

35.    Spot freight matching services are services that help match carriers with third-party brokers looking to arrange shipments.  These services include traditional load boards like DAT's load board where anyone with a subscription may post and view loads, and also include more sophisticated tech-enabled platforms like Convoy for Brokers.

36.    No other services are substitutable for, or reasonably interchangeable with, spot freight matching services.  If a hypothetical monopolist in the spot freight matching services market imposed a small but significant non-transitory price increase for its spot freight matching services, sufficient customers would not replace those services with others so as to make the price increase unprofitable.

37.    Spot freight matching services are not reasonably interchangeable with contract freight.  Spot freight matching services exist because of loads and shipping capacity that are not covered by long-term contracts.  The rates for shipping freight in the spot market differ substantially from contract rates, reflecting the fact that brokers cannot substitute spot capacity with contracted capacity.  Moreover, in general, only the largest brokers and carrier networks have the volume and sales teams necessary to participate in the contract freight RFP process.  Spot freight matching services are the primary way for brokers to access the vast number of small and medium-sized carriers that do not participate in the contract RFP process.

38.    Nor is manually or individually matching loads reasonably interchangeable with spot freight matching services.  Without spot freight matching services, an individual broker or

carrier will be limited to their network of personal connections.  While some carriers and brokers might use individual load matching in addition to posting on spot freight matching services, the two techniques are not economic substitutes for one another.  DAT acknowledges "no matter how many cold calls and personal connections you make, you will inevitably need to rely on load boards to cover at least part of your freight."[9]

39.     Single-broker networks are also not reasonably interchangeable with spot freight matching services.  Third-party brokers looking for carriers cannot access single-broker or broker-captive networks to post loads or find capacity.

40.     The relevant geographic market is the United States.

**B.    DAT Has Monopoly Power in the Spot Freight Matching Services Market**

41.     Although DAT's load board has not evolved much beyond a digital version of its bulletin board, DAT nonetheless dominates the market for spot freight matching services.  DAT has achieved and maintained this dominance through a series of practices that were designed to, and did, artificially insulate DAT's load board from competition.

42.     DAT touts its dominance in spot freight matching services.  DAT is the "largest truckload freight marketplace in North America"[10] with "more listings than any other load board."[11] DAT claims to have "3 times more trucks than any other load board."[12]  Indeed, DAT boasts on its website that "you can find millions of loads that are ***only on DAT***,"[13] and claims to

---

[9] https://www.dat.com/resources/how-to-become-a-successful-freight-broker.
[10] https://www.dat.com/.
[11] .https://www.dat.com/solutions/what-is-a-load-board.
[12] https://forms.dat.com/brokers/find-trucks.
[13] https://www.dat.com/solutions/what-is-a-load-board (emphasis added).

be the "exclusive load board partner of the Owner-Operator Independent Drivers Association."[14]
The OOIDA has "more than 150,000 members."[15]

43.    DAT advertises that 887,000 loads are posted to its load board per business day
and that 227 million loads are posted to DAT annually.[16]  DAT's advertised 887,000 is more
than two-and-a-half times the number of loads posted to the next-largest load board,
Truckstop.com.

44.    DAT's 887,000 loads per day would mean that over 40% of **all** full truckloads in
the United States are posted to DAT's load board.  This 40% is relative to the entire universe of
truckload freight, including the volume covered by contract and asset carriers.  Thus, DAT's
share of the loads posted to spot freight matching services is far higher.

45.    DAT's load board has over 64% share of the relevant market based on the volume
of loads posted to DAT and the understanding that a significant portion of those loads are
exclusive to DAT.

46.    The theoretical ability of a broker or shipper to post loads to multiple spot freight
matching services does not meaningfully constrain DAT's monopoly power.  Nor does the
theoretical ability of a carrier to participate in multiple services meaningfully constrain DAT's
monopoly power.  DAT has locked up exclusives or valuable "first looks" at loads, which means
that loads will almost always be listed on DAT, and many exclusively.  As explained further
below, DAT enters into exclusive contracts, requiring customers to use only DAT's load board.
DAT advertises that, on an annual basis, approximately 76% of the loads posted to DAT are

---

[14] https://www.dat.com/solutions/load-board-for-owner-operators.
[15] https://www.ooida.com.
[16] https://www.dat.com.

"posted first on DAT or nowhere else."[17]  Indeed, DAT boasts on its website that "you can find millions of loads that are *only on DAT*."[18]  With respect to carriers, DAT claims to be "exclusive load board partner of the Owner-Operator Independent Drivers Association."[19] The OOIDA has "more than 150,000 members."[20]  While carriers and brokers might choose to use another service *in addition to DAT*, most feel that they must have access to DAT.  Thus, DAT's load board is widely considered to be the "must have" service, and a second or third spot freight matching service might be optional.

47.    There is also direct evidence of DAT's monopoly power in the spot freight matching services market.  DAT was able to charge higher-than-competitive prices to Convoy while Convoy was a DAT customer and needed access to DAT's load board for Convoy's brokerage business.  DAT was also able to demand unreasonable and anticompetitive business terms including prohibiting Convoy from providing data to any competitive service or posting loads to any other load boards, which Convoy had little option but to accept or risk losing access to DAT's load board and data.

48.    DAT's monopoly is protected by barriers to entry, most significantly the ones that DAT has created through its non-competition agreements and exclusive contracts.

49.    DAT's monopoly is also protected by network effects.  The value to brokers of a spot freight matching service increases with the number of carriers and/or volume of capacity that participates in the service.  Conversely, the value to carriers of a spot freight matching service increases with the number of brokers and/or the volume of loads that participate in the

---

[17] *Id.*

[18] https://www.dat.com/solutions/what-is-a-load-board (emphasis added).

[19] https://www.dat.com/solutions/load-board-for-owner-operators.

[20] https://www.ooida.com.

service.  DAT's exclusives therefore have effects beyond just the volume covered by those contracts; every carrier, broker, or load that is exclusive to DAT reinforces DAT's position as a "must have" matching service.

50.    Convoy for Brokers competes with DAT in the market for services that match carriers with brokers for spot freight shipments.  Both DAT's load board and Convoy for Brokers allow third-party brokers to find capacity by posting shipments and allow carriers to find spot freight loads.  But the similarities end there.

51.    DAT's load board is a large, relatively unmanaged marketplace that simply lists loads and carriers.  Subscribers pay a flat fee to post and view loads on the board.

52.    Convoy for Brokers does far more: by way of examples, Convoy for Brokers uses machine-learning to automatically match carriers and shippers or brokers; Convoy pre-vets carriers on the network and does ongoing performance monitoring; the platform itself facilitates the transactions; shipping documentation is uploaded and stored electronically; shipments are tracked and updated using GPS; and Convoy handles invoicing and payment, rather than the carriers and shippers or brokers.

53.    While DAT's load board is little more than a digital bulletin board, Convoy for Brokers is an end-to-end shipping tool.  That is one reason why DAT seeks an order in this case "shutting down and dismantling" Convoy's revolutionary service.

## III.    DAT's Anticompetitive Conduct

54.    DAT maintains its monopoly position in the spot freight matching services market through an interrelated and mutually reinforcing set of practices.

55.    DAT has aimed these practices at digitally enabled companies like Convoy, who pose a unique threat to DAT's traditional dominance.  On information and belief, DAT has

engaged in similar practices with other digital-native companies that use data and automation to improve efficiency in the trucking industry.

### A.    DAT Bars Its Customers from Competing with DAT

56.    DAT leverages its dominant position to impose patently anticompetitive restrictions on customers who need access to DAT's load board to find spot freight capacity or shipments.

57.    On November 7, 2018, DAT and Convoy entered into a National Account Agreement that permitted Convoy to access and utilize certain DAT products and services, including DAT's load board.  At the time, Convoy had little choice but to agree to the National Account Agreement because Convoy's brokerage business still relied on access to DAT's load board.  A copy of the National Account Agreement is attached hereto as **Exhibit 1**.

58.    The initial term of the National Account Agreement was three years, and it was set to automatically renew every year after that.

59.    Section 4 of the National Account Agreement, entitled "NON-COMPETE AS A LOAD BOARD," states in relevant part that "[d]uring the Term, Customer may not create a load board wherein they aggregate other brokers' loads with the intent of competing with DAT." DAT interprets this non-compete provision to bar Convoy from providing any competitive product or service, even if Convoy did so using its own independent efforts, and without using anything belonging to DAT.  *E.g.*, Compl. ¶ 30.  Moreover, DAT interprets this provision to bar Convoy from even ***preparing*** to compete while it was a DAT customer.  *E.g., id.* ¶ 8.

60.    DAT presented the National Account Agreement—with the competition prohibition—to Convoy as a form agreement and DAT insisted on the competition prohibition provision.

61.     Thus, DAT conditioned Convoy's access to DAT's "must have" load board on a promise that Convoy would not compete or even prepare to compete with DAT for at least three years.  In other words, DAT required Convoy to cede the market to DAT.  DAT is now weaponizing the competition prohibition to attempt to "shut down and dismantle" Convoy for Brokers.

62.     As interpreted by DAT, the competition prohibition in the National Account Agreement is not ancillary to a legitimate transaction nor narrowly tailored to protect DAT's intellectual property.  DAT is using the provision to prohibit all competition or potential competition, even if the new product or service uses nothing of DAT's.

63.     On information and belief, DAT has imposed similar competition prohibitions on other digitally native DAT customers that might pose a competitive challenge to DAT's legacy market dominance.

**B.     DAT Requires Customers to Use Its Load Board Exclusively**

64.     In addition to broadly prohibiting consumers like Convoy from competing with DAT, DAT also requires customers like Convoy to pay higher prices unless they agree to use DAT's load board exclusively and refrain from using or sharing any load or capacity data with DAT's competitors.  Thus, DAT penalizes its customers if they want to use any other load board or share data with any other load board.

65.     For instance, on November 7, 2018, DAT and Convoy entered into a Products and Pricing Supplement to the National Account Agreement.  A copy of the Supplement (which DAT did not attach to its Complaint) is attached hereto as **Exhibit 2**.  The Supplement provides "exclusive pricing" so long as Convoy "agrees at all times to integrate exclusively with DAT" and to "not use any load board other than the DAT load board and/or any load board offered by

DAT affiliate company(s)."  Failure to remain exclusive would result in a monthly penalty and surcharge.  *Id.* at 3.

66.    DAT did, in fact, require Convoy to pay a penalty when Convoy asked to be released from its exclusivity commitments.  On June 18, 2020, the parties agreed to Amendment 1 to the National Account Agreement which (in Section 1 thereof) increased the price for Convoy's access to DAT's load board in exchange for Convoy receiving the right to use other load boards.  A copy of Amendment 1 (which DAT did not attach to its Complaint) is attached hereto as **Exhibit 3**.  The Amendment also prohibited Convoy from issuing any press releases or marketing statements announcing its use of a competing load board.  *Id.*  Convoy remained obligated to share all of its load data with DAT, and was barred from "contribut[ing] data to any other service which aggregates data for purposes of providing trucking lane rates and is deemed a competitive service by DAT."  *Id.* § 2.  Thus, even after Convoy bought the right to use another load board, DAT still maintained its ability to thwart any potential competition by barring Convoy from sharing Convoy's own data with anyone "deemed a competitive service by DAT."

67.    On information and belief, DAT has coerced other digitally native customers into similar exclusive arrangements.   Indeed, DAT boasts on its website that "you can find millions of loads that are ***only on DAT***,"[21] and claims to be the "exclusive load board partner of the Owner-Operator Independent Drivers Association."[22]

### C.    DAT Leverages Its Must-Have Status to Insulate Its Load Board from Competition

68.    DAT also leverages the data it obtains from running the dominant load board into yet more barriers to competition and artificial advantages for DAT.

---

[21] https://www.dat.com/solutions/what-is-a-load-board (emphasis added).
[22] https://www.dat.com/solutions/load-board-for-owner-operators.

69.     Also on November 7, 2018, DAT and Convoy entered into a RateView Service Addendum to the National Account Agreement, providing Convoy access to DAT's RateView data service.  The RateView Service Addendum is attached hereto as **Exhibit 4**.  The Addendum states that in order for Convoy to pay standard pricing for DAT's RateView service, Convoy "must be exclusive with DAT and shall not contribute data to any other service which aggregates data for purposes of providing trucking lane rates and is deemed a competitive service by DAT." The Addendum also forced Convoy to "contribute data upon rate confirmation on at least a daily basis on all lane rates for which [Convoy] pays or is paid."  *Id.* § 2.  If Convoy failed to do so, then DAT could increase Convoy's monthly fees or terminate Convoy altogether, at any time. *Id.*

70.     On information and belief, DAT forces other digitally native broker customers to agree to the same or similar exclusivity provisions as a condition for accessing DAT's products and services, or pay a substantial penalty for using or sharing data with DAT's competitors.

71.     DAT's RateView exclusivity insulates DAT's load board from competition. DAT alleges in its Complaint that its RateView benchmark rate is generated "using both historical and real-time data available to DAT *(and only DAT)* by virtue of its decades-long maintenance of America's most recognized freight market, and its proprietary methods for the aggregation and analysis of hundreds of millions of potential and actual shipping transactions." Compl. ¶ 21 (emphasis added).  The more shipping data that DAT collects, the more accurate its RateView benchmark becomes.  And the less shipping data that competitors collect, the less accurate their benchmarks can be.  According to DAT, one cannot build a load board without these types of data.

72.    Indeed, DAT boasts in its Complaint that it is virtually **_impossible_** to build a competing data analytics service or load board without the data that DAT's consumers must share, and can only share, with DAT.  DAT alleges that "Convoy could not have built (and did not build) its pricing algorithm, or otherwise create a functional load board, without using and misappropriating the proprietary data and trade secrets it was accessing for improper purposes on the DAT load board."  Compl. ¶ 46.  DAT further alleges that "**_[t]he only source_** from which Convoy could have obtained (and did obtain) the volume and quality of data and information needed to develop and launch its competing load board and/or its pricing algorithm is the DAT load board …."  *Id.* ¶ 47 (emphasis added).  While DAT's allegations are untrue, they illustrate DAT's view that no company could provide spot freight matching services without access to the data that DAT ensures it has exclusive access to.

73.    DAT is also using its leverage as a dominant player in the spot freight matching services market to intimidate brokers into refraining from doing business with Convoy.  On information and belief, DAT has stopped brokers from using Convoy's services and from posting loads onto Convoy for Brokers.  These brokers have no choice but to agree to DAT's demands or risk losing access to DAT's load board and data.

## IV.    Anticompetitive Effects

74.    The anticompetitive behavior described herein has substantially foreclosed and distorted competition in the market for spot freight matching services, and has allowed DAT to dominate and maintain its dominance in that market.

75.    Convoy for Brokers poses a unique competitive threat to legacy spot freight matching services like DAT's load board.  Imposing blanket competition prohibitions on Convoy

and other similar companies allows DAT to eliminate the most significant potential threats to its market position.

76.     On information and belief, DAT's conduct has also dissuaded other would-be competitors from entering the spot freight matching services market out of fear of being cut off or shut down by DAT, as DAT is attempting to do to Convoy in this very lawsuit.  DAT's conduct also dissuades would-be customers of competing spot freight matching services from working with DAT's potential competitors.

77.     DAT's exclusivity provisions entrench its advantage as a must-have service and stifle innovation in the spot freight matching services market.  By contracting for exclusivity and threatening customers with loss of access to DAT's load board if they work with competitors, DAT has deprived other spot freight matching services of the volume of customers and loads required to challenge DAT's dominance and obtain new customers.  Network effects compound and exacerbate the effects of each of DAT's exclusive contracts.

78.     In addition, by contractually prohibiting customers from sharing data with its competitors as a condition for accessing DAT's must-have service, DAT denies potential competitors the volume and pricing data they need to compete.  At the same time, DAT leverages its market dominance by unreasonably forcing consumers to share all of their shipping data with DAT as a condition for accessing DAT's service, lest they risk paying penalties or being terminated altogether.  This is designed to ensure that DAT—and only DAT—has enough data to predict shipping rates.

79.     This anticompetitive behavior negatively affects consumers in the spot freight matching services market by: (i) forcing them to pay higher prices and provide more data in exchange for DAT's products and services than they would otherwise pay if DAT faced

substantial competition; (ii) reducing the quality of services in the relevant market, including by reducing the number and quality of loads available on non-DAT spot freight matching services; (iii) preventing competitors from acquiring enough data to create viable alternatives to DAT; and (iv) stifling innovation in the trucking industry, including by shutting down disrupters like Convoy who face legal action for merely competing with DAT.

80.    Convoy itself has suffered, and will continue to suffer, injury in fact and antitrust injury by virtue of DAT's conduct.  As a DAT load board customer, Convoy was prohibited from using other load boards for several years, and was required to purchase from DAT the opportunity to do so.  When Convoy did buy itself out of DAT's exclusivity requirements, Convoy found that competing services lacked coverage and quality because DAT had locked up a substantial portion of the relevant market and denied others access to data.  Moreover, Convoy had to accede to DAT's unreasonable demands, such as sharing all of Convoy's load data as a condition for accessing DAT's RateView service.

81.    Convoy has also suffered, and will continue to suffer, harm as a competitor of DAT and a market innovator.  DAT has, through this action, weaponized the National Account Agreement in an attempt to shut down Convoy for Brokers and thus to extinguish a competitor and disrupter in the relevant market.  DAT has also deprived Convoy for Brokers of potential consumers by requiring other brokers to agree to exclusivity provisions that prohibit brokers from using or posting loads to Convoy for Brokers.

## CAUSES OF ACTION

### COUNTERCLAIM ONE
### (Illegal Contracts in Restraint of Trade in violation of 15 U.S.C. § 1)

82.    Convoy incorporates all preceding paragraphs as if fully set forth herein.

83.    DAT maintains a greater than 64% share of the relevant market for services that match third-party brokers with carriers for spot freight shipments.

84.    DAT's market dominance enables it to impose anticompetitive contract terms on customers (like Convoy) who need to access DAT's load board in order to find freight load capacity.

85.    DAT requires companies like Convoy to agree not to compete with DAT as a condition of their access to DAT's load board.

86.    DAT's competition prohibitions are *per se* illegal because they are agreements that allocate the spot freight matching services market to DAT.

87.    In the alternative, DAT's competition prohibitions are unreasonable restraints of trade because they foreclose a substantial amount of competition in the spot freight matching services market and provide no corresponding procompetitive benefits.

88.    DAT has also entered into exclusive contracts providing that customers will use DAT exclusively for spot freight matching services.  These contracts are unreasonable restraints of trade alone and in combination with the competition prohibitions.

89.    The anticompetitive contract terms imposed by DAT on consumers interfere with normal market competition in a substantial portion of the spot freight matching services market, including by: (i) prohibiting competition by all consumers who use DAT's products and services; and (ii) ensuring that customers exclusively use DAT's load board and refrain from using or sharing data with DAT's competitors.

90.    The anticompetitive terms imposed by DAT on consumers foreclose and distort competition in the spot freight matching services market, and in so doing, negatively affect consumers by: (i) forcing them to pay higher prices and provide more data in exchange for

freight matching services than they would in a more competitive market; (ii) reducing the quality of those services below that which would be available in a more competitive market; and (iii) stifling innovation in the trucking industry.

91.    Convoy itself has suffered, and will continue to suffer, injury in fact and antitrust injury by virtue of the anticompetitive terms imposed by DAT.  As a DAT load board customer, Convoy was prohibited from using other load boards for several years, and was required to purchase from DAT the opportunity to do so.  When Convoy did buy itself out of DAT's exclusivity requirements, Convoy found that competing load boards lacked coverage and quality because DAT had locked up a substantial portion of the relevant market.  Convoy was also required to accede to DAT's unreasonable contract demands, such as sharing all of Convoy's load data as a condition for accessing DAT's rate data service.  Convoy has suffered and continues to suffer monetary harm in an amount to be proven at trial.

92.    Convoy has also suffered, and will continue to suffer, harm as a competitor of DAT and a market innovator.  DAT has, through this action, weaponized the National Account Agreement in an attempt to shut down Convoy for Brokers and thus to extinguish a competitor and disrupter in the relevant market.  DAT has deprived Convoy for Brokers of potential consumers by requiring other brokers to agree to exclusivity provisions that prohibit brokers from using Convoy for Brokers.  DAT is also using its leverage as a must-have load board and rate data source to intimidate other brokers from doing business with Convoy, including posting loads to Convoy for Brokers.  Convoy has suffered and continues to suffer monetary harm in an amount to be proven at trial.

## COUNTERCLAIM TWO
### (Monopolization in violation of 15 U.S.C. § 2)

93.    Convoy incorporates all preceding paragraphs as if fully set forth herein.

94.    DAT maintains a greater than 64% share of the relevant market for services that match third-party brokers with carriers for spot freight shipments.

95.    DAT unlawfully obtained and maintains its monopoly through a pattern of interrelated and mutually reinforcing exclusionary tactics, including: (i) imposing blanket non-compete requirements on customers who might in the future pose a competitive threat to DAT; (ii) entering into multiple exclusive agreements with carriers and brokers requiring those carriers and brokers to use DAT's load board exclusively; and (iii) using its leverage as a must-have load board and rate data source to scare brokers away from doing business with competitors.

96.    DAT's anticompetitive tactics harm consumers in the relevant market by: (i) forcing them to pay higher prices for spot freight matching services than they would in a more competitive market; (ii) reducing the quality of those services below that which would be available in a more competitive market; (iii) stifling innovation in the trucking industry; and (iv) forcing consumers to agree to additional unreasonable conditions designed to entrench DAT's market advantage and insulate it from competition, including the complete sharing of consumer load data as a condition for accessing DAT's rate data service.

97.    Convoy itself has suffered, and will continue to suffer, injury in fact and antitrust injury by virtue of DAT's anticompetitive tactics.  As a DAT load board customer, Convoy was prohibited from using other load boards for several years, and was required to purchase from DAT the opportunity to do so.  When Convoy did buy itself out of DAT's exclusivity requirements, Convoy found that competing load boards lacked coverage and quality because DAT had locked up a substantial portion of the relevant market.  Convoy was also required to accede to DAT's unreasonable contract demands, such as sharing all of Convoy's load data as a

condition for accessing DAT's rate data service. Convoy has suffered and continues to suffer monetary harm in an amount to be proven at trial.

98.    Convoy has also suffered, and will continue to suffer, harm as a competitor of DAT and a market innovator. DAT has, through this action, weaponized the National Account Agreement in an attempt to shut down Convoy for Brokers and thus to extinguish a competitor and disrupter in the relevant market. DAT has deprived Convoy for Brokers of potential consumers by requiring other brokers to agree to exclusivity provisions that prohibit brokers from using Convoy for Brokers. DAT is also using its leverage as a must-have load board and rate data source to intimidate other brokers from doing business with Convoy, including accessing loads and posting loads. Convoy has suffered and continues to suffer monetary harm in an amount to be proven at trial.

## COUNTERCLAIM THREE
### (Attempted Monopolization in violation of 15 U.S.C. § 2)

99.    Convoy incorporates all preceding paragraphs as if fully set forth herein.

100.    If DAT does not already have monopoly power in the relevant market, in the alternative there is a dangerous probability that DAT will obtain monopoly power through its exclusionary conduct. DAT already boasts that it is the "largest truckload freight marketplace in North America"[23] with "more listings than any other load board"[24] and "3 times more trucks than any other load board" in the relevant market.[25] DAT has intentionally and unlawfully attempted, and is attempting, to monopolize the market for spot freight matching services.

---

[23] https://www.dat.com/.
[24] https://www.dat.com/solutions/what-is-a-load-board.
[25] https://forms.dat.com/brokers/find-trucks.

101.    DAT is attempting to monopolize the spot freight matching services market through a pattern of exclusionary tactics, including: (i) imposing blanket non-compete requirements on customers (like Convoy) who might pose a competitive threat to DAT; (ii) entering into multiple exclusive agreements with carriers and brokers requiring those services only to use and share data with DAT; and (iii) using its leverage as a must-have load board and rate data source to scare brokers away from doing business with competitors.

102.    This anticompetitive conduct is evidence of DAT's specific intent to monopolize the market for spot freight matching services.

103.    The anticompetitive terms imposed by DAT on consumers foreclose and distort competition in the spot freight matching services market, and in so doing, negatively affect consumers by: (i) forcing them to pay higher prices for spot freight matching services; (ii) reducing the quality of those services; (iii) stifling innovation in the trucking industry; and (iv) forcing consumers to agree to additional unreasonable conditions designed to entrench DAT's market advantage and insulate it from competition, including the complete sharing of consumer load data as a condition for accessing DAT's rate data service.

104.    Convoy itself has suffered, and will continue to suffer, injury in fact and antitrust injury by virtue of the anticompetitive terms imposed by DAT.  As a DAT load board customer, Convoy was prohibited from using other load boards for several years, and was required to purchase from DAT the opportunity to do so.  When Convoy did buy itself out of DAT's exclusivity requirements, Convoy found that competing load boards lacked coverage and quality because DAT had locked up a substantial portion of the relevant market.  Convoy was also required to accede to DAT's unreasonable contract demands, such as sharing all of Convoy's

load data as a condition for accessing DAT's rate data service. Convoy has suffered and continues to suffer monetary harm in an amount to be proven at trial.

105.    Convoy has also suffered, and will continue to suffer, harm as a competitor of DAT and a market innovator. DAT has, through this action, weaponized the National Account Agreement in an attempt to shut down Convoy for Brokers and thus to extinguish a competitor and disrupter in the relevant market. DAT has deprived Convoy for Brokers of potential consumers by requiring other brokers to agree to exclusivity provisions that prohibit brokers from using Convoy for Brokers. DAT is also using its leverage as a must-have load board and rate data source to intimate other brokers from doing business with Convoy, including accessing loads and posting loads. Convoy has suffered and continues to suffer monetary harm in an amount to be proven at trial.

### COUNTERCLAIM FOUR
### (Illegal Contracts in Restraint of Trade in violation of Oregon Rev. Stat. 646.725)

106.    Convoy incorporates all preceding paragraphs as if fully set forth herein.

107.    DAT maintains a greater than 64% share of the relevant market for services that match third-party brokers with carriers for spot freight shipments.

108.    DAT's market dominance enables it to impose anticompetitive contract terms on customers (like Convoy) who need to access DAT's load board in order to find freight load capacity and determine prevailing load rates.

109.    DAT requires companies like Convoy to agree not to compete with DAT as a condition of their access to DAT's load board.

110.    DAT's competition prohibitions are *per se* illegal because they are agreements that allocate the spot freight matching services market to DAT.

111.    In the alternative, DAT's competition prohibitions are unreasonable restraints of trade because they foreclose a substantial amount of competition in the spot freight matching market and provide no corresponding procompetitive benefits.

112.    DAT has also entered into exclusive contracts providing that customers will use DAT exclusively for spot freight matching services.  These contracts are unreasonable restraints of trade alone and in combination with the competition prohibitions.

113.    The anticompetitive contract terms imposed by DAT on consumers interfere with normal free-market competition in a substantial portion of the spot freight matching services market, including by: (i) prohibiting competition by all consumers who use DAT's products and services, even if those consumers refrain from using anything belonging to DAT; and (ii) demanding higher prices unless consumers agree to exclusively use DAT's load board and refrain from using or sharing data with DAT's competitors.

114.    The anticompetitive terms imposed by DAT on consumers foreclose and distort competition in the spot freight matching services market, and in so doing, negatively affect consumers by: (i) forcing them to pay higher prices for spot freight matching services; (ii) reducing the quality of those services; (iii) stifling innovation in the trucking industry; and (iv) forcing consumers to agree to additional unreasonable conditions designed to entrench DAT's market advantage and insulate it from competition, including the complete sharing of consumer load data as a condition for accessing DAT's rate data service.

115.    Convoy itself has suffered, and will continue to suffer, injury in fact and antitrust injury by virtue of the anticompetitive terms imposed by DAT.  As a DAT load board customer, Convoy was prohibited from using other load boards for several years, and was required to purchase from DAT the opportunity to do so.  When Convoy did buy itself out of DAT's

exclusivity requirements, Convoy found that competing load boards lacked coverage and quality because DAT had locked up a substantial portion of the relevant market. Convoy was also required to accede to DAT's unreasonable contract demands, such as sharing all of Convoy's load data as a condition for accessing DAT's rate data service. Convoy has suffered and continues to suffer monetary harm in an amount to be proven at trial.

116.    Convoy has also suffered, and will continue to suffer, harm as a competitor of DAT and a market innovator. DAT has, through this action, weaponized the National Account Agreement in an attempt to shut down Convoy for Brokers and thus to extinguish a competitor and disrupter in the relevant market. DAT has also deprived Convoy for Brokers of potential consumers by requiring other brokers to agree to exclusivity provisions that prohibit brokers from using Convoy for Brokers. DAT is also using its leverage as a must-have load board and rate data source to intimate other brokers from doing business with Convoy, including accessing loads and posting loads. Convoy has suffered and continues to suffer monetary harm in an amount to be proven at trial.

## COUNTERCLAIM FIVE
### (Monopolization in violation of Oregon Rev. Stat. 646.730)

117.    Convoy incorporates all preceding paragraphs as if fully set forth herein.

118.    DAT maintains a greater than 64% share of the relevant market for services that match third-party brokers with carriers for spot freight shipments.

119.    DAT unlawfully obtained and maintains its monopoly through a pattern of interrelated exclusionary tactics, including: (i) imposing blanket non-compete requirements on customers who might in the future pose a competitive threat to DAT; (ii) entering into multiple exclusive agreements with carriers and brokers requiring those carriers and brokers to use DAT's

load board exclusively; and (iii) using its leverage as a must-have load board and rate data source to scare brokers away from doing business with competitors.

120.    DAT's anticompetitive tactics harm consumers in the relevant market by: (i) forcing them to pay higher prices for spot freight matching services than they would in a more competitive market; (ii) reducing the quality of those services; (iii) stifling innovation in the trucking industry; and (iv) forcing consumers to agree to additional unreasonable conditions designed to entrench DAT's market advantage and insulate it from competition, including the complete sharing of consumer load data as a condition for accessing DAT's rate data service.

121.    Convoy itself has suffered, and will continue to suffer, injury in fact and antitrust injury by virtue of DAT's anticompetitive tactics.  As a DAT load board customer, Convoy was prohibited from using other load boards for several years, and was required to purchase from DAT the opportunity to do so.  When Convoy did buy itself out of DAT's exclusivity requirements, Convoy found that competing load boards lacked coverage and quality because DAT had locked up a substantial portion of the relevant market.  Convoy was also required to accede to DAT's unreasonable contract demands, such as sharing all of Convoy's load data as a condition for accessing DAT's rate data service.  Convoy has suffered and continues to suffer monetary harm in an amount to be proven at trial.

122.    Convoy has also suffered, and will continue to suffer, harm as a competitor of DAT and a market innovator.  DAT has, through this action, weaponized the National Account Agreement in an attempt to shut down Convoy for Brokers and thus to extinguish a competitor and disrupter in the relevant market.  DAT has deprived Convoy for Brokers of potential consumers by requiring other brokers to agree to exclusivity provisions that prohibit brokers from using Convoy for Brokers.  DAT is also using its leverage as a must-have load board and

rate data source to intimate other brokers from doing business with Convoy, including accessing loads and posting loads. Convoy has suffered and continues to suffer monetary harm in an amount to be proven at trial.

### COUNTERCLAIM SIX
### (Attempted Monopolization in violation of Oregon Rev. Stat. 646.730)

123. Convoy incorporates all preceding paragraphs as if fully set forth herein.

124. If DAT does not already have monopoly power in the relevant market, in the alternative there is a dangerous probability that DAT will obtain monopoly power through its exclusionary conduct. DAT already boasts that it is the "largest truckload freight marketplace in North America"[26] with "more listings than any other load board"[27] and "3 times more trucks than any other load board" in the relevant market.[28] DAT has intentionally and unlawfully attempted to monopolize the market for spot freight matching services.

125. DAT is attempting to monopolize the spot freight matching services market through a pattern of exclusionary tactics, including: (i) imposing blanket non-compete requirements on customers (like Convoy) who might pose a competitive threat to DAT; (ii) entering into multiple exclusive agreements with carriers and brokers requiring those services only to use and share data with DAT; and (iii) using its leverage as a must-have load board and rate data source to scare brokers away from doing business with competitors.

126. This anticompetitive conduct is evidence of DAT's specific intent to monopolize the market for spot freight matching services.

---

[26] https://www.dat.com/.
[27] https://www.dat.com/solutions/what-is-a-load-board.
[28] https://forms.dat.com/brokers/find-trucks.

127.    The anticompetitive terms imposed by DAT on consumers foreclose and distort competition in the spot freight matching services market, and in so doing, negatively affect consumers by: (i) forcing them to pay higher prices for spot freight matching services; (ii) reducing the quality of those services; (iii) stifling innovation in the trucking industry; and (iv) forcing consumers to agree to additional unreasonable conditions designed to entrench DAT's market advantage and insulate it from competition, including the complete sharing of consumer load data as a condition for accessing DAT's rate data service.

128.    Convoy itself has suffered, and will continue to suffer, injury in fact and antitrust injury by virtue of the anticompetitive terms imposed by DAT.  As a DAT load board customer, Convoy was prohibited from using other load boards for several years, and was required to purchase from DAT the opportunity to do so.  When Convoy did buy itself out of DAT's exclusivity requirements, Convoy found that competing load boards lacked coverage and quality because DAT had locked up a substantial portion of the relevant market.  Convoy was also required to accede to DAT's unreasonable contract demands, such as sharing all of Convoy's load data as a condition for accessing DAT's rate data service.  Convoy has suffered and continues to suffer monetary harm in an amount to be proven at trial.

129.    Convoy has also suffered, and will continue to suffer, harm as a competitor of DAT and a market innovator.  DAT has, through this action, weaponized the National Account Agreement in an attempt to shut down Convoy for Brokers and thus to extinguish a competitor and disrupter in the relevant market.  DAT has deprived Convoy for Brokers of potential consumers by requiring other brokers to agree to exclusivity provisions that prohibit brokers from using Convoy for Brokers.  DAT is also using its leverage as a must-have load board and rate data source to intimate other brokers from doing business with Convoy, including accessing

loads and posting loads  Convoy has suffered and continues to suffer monetary harm in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Convoy respectfully requests the following relief:

A.      A declaration that the non-compete and exclusivity provisions in DAT's agreements with Convoy are void and unenforceable;

B.      An order enjoining DAT from enforcing or entering into similar anticompetitive agreements in the future;

C.      An order enjoining DAT from continuing to violate the antitrust laws and entering relief to restore competition;

D.      An award equal to treble the amount of damages that Convoy has suffered by reason of the antitrust violations alleged herein;

E.      An award of Convoy's reasonable costs and expenses, including attorneys' fees and expert fees and pre-and post-judgment interest; and

F.      Such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Convoy demands a trial by jury on all triable issues contained in its Counterclaims.

Dated: June 17, 2022

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI, P.C.

_s/ Amy Candido_
Amy Candido (_pro hac vice_)
acandido@wsgr.com
Charles Tait Graves (_pro hac vice_)
tgraves@wsgr.com
Jordan Jaffe (_pro hac vice_)
jjaffe@wsgr.com
Justina Sessions (_pro hac vice forthcoming_)
jsessions@wsgr.com
Telephone: (415) 947-2000

and

STOEL RIVES LLP
Per A. Ramfjord, OSB No. 934024
per.ramfjord@stoel.com
Telephone: (503) 224-3380

_Attorneys for Convoy, Inc._