Marjorie A. Elken, OSB No. 073368
MAE@buckley-law.com
Buckley Law P.C.
5300 Meadows Road, Suite 200
Lake Oswego, OR 97035
Telephone: +1 503 620 8900
Facsimile: +1 503 620 4878

and

Damond R. Mace (admitted *pro hac vice*)
Sean L. McGrane (admitted *pro hac vice*)
Marissa Black (admitted *pro hac vice*)
damond.mace@squirepb.com
sean.mcgrane@squirepb.com
marissa.black@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
1000 Key Tower
127 Public Square
Cleveland, Ohio 44114
Telephone: +1 216 479 8500
Facsimile: +1 216 479 8780

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| DAT SOLUTIONS, LLC, | Case No.: 3:22-CV-00088-IM |
| Plaintiff, | |
| v. | DAT SOLUTIONS, LLC'S MOTION TO DISMISS COUNTERCLAIMS |
| CONVOY, INC., | ORAL ARGUMENT REQUESTED |
| Defendant. | |

**TABLE OF CONTENTS**

LOCAL RULE 7.1(a) COMPLIANCE.................................................................1

MOTION .................................................................................................1

MEMORANDUM IN SUPPORT ..................................................................1

PRELIMINARY STATEMENT ....................................................................1

RELEVANT FACTUAL AND PROCEDURAL BACKGROUND.........................4

    A.    The parties and the relevant contracts.................................4

    B.    Convoy launches its competing load board.........................6

    C.    DAT commences this Action ...........................................7

LAW & ARGUMENT ..............................................................................7

I.    The standards governing this motion, and the required elements of Convoy's counterclaims ...........................................................7

    A.    The standards governing this 12(b)(6) motion ...................7

    B.    The required elements of Convoy's counterclaims ............8

II.    Convoy fails to sufficiently allege actionable anti-competitive conduct under the Sherman Act (Counts One-Three)...................................10

    A.    Count One – Section 1 of the Sherman Act ......................10

        1.    The so-called "exclusive dealing" provisions are not anti-competitive under Section 1.................12

        2.    The limited non-compete provisions are lawful...................14

    B.    The Section 2 claims fail for the same reasons—no anticompetitive conduct ...............................................16

III.    Convoy fails to adequately allege monopoly power .......................17

    A.    Monopolization (Count Two)..........................................17

    B.    Attempted Monopolization (Count Three)........................20

IV.    Convoy fails to sufficiently allege the requisite antitrust injury to competition (All Counts)................................................................22

V.    Convoy's state law claims also should be dismissed ....................24

CONCLUSION.......................................................................................25

**Cases**

*3Shape Trios A/S v. Align Tech., Inc.*,
    2019 U.S. Dist. LEXIS 137982 (D. Del. Aug. 15, 2019) ..................................................13

*Aaronson v. Kangarani*,
    2019 U.S. Dist. LEXIS 127890 (D. Or. June 20, 2019) ......................................................18

*Actuant Corp. v. Huffman*,
    2005 U.S. Dist. LEXIS 49629 (D. Or. Feb. 18, 2005) ........................................................15

*Allstate Ins. Co. v. Rote*,
    2016 U.S. Dist. LEXIS 104374 (D. Or. Aug. 7, 2016) ......................................................15

*Am. Prof'l Testing Serv. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns*,
    108 F.3d 1147 (9th Cir. 1997) ............................................................................... 3, 19, 21

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) .....................................................................................22, 24

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) ............................................................................................................13

*Coca-Cola Bottling Co. v. Coca-Cola Co.*,
    696 F. Supp. 97 (D. Del. 1988) .........................................................................................21

*CollegenNET, Inc. v. Common Application, Inc.*,
    104 F. Supp. 3d 1137 (D. Or. 2015) ..................................................................................22

*Corsearch, Inc. v. Thomson & Thomson*,
    792 F. Supp. 305 (S.D.N.Y. 1992) ....................................................................................15

*Eastman v. Quest Diagnostics, Inc.*,
    724 F. App'x. 556 (9th Cir. 2018) .............................................................................. 12, 23

*Epic Games, Inc. v. Apple Inc.*,
    559 F. Supp. 3d 898 (N.D. Cal. 2021) ...............................................................................18

*Expedite, Inc. v. Plus, Bags, Cars & Serv., LLC*,
    2011 U.S. Dist. LEXIS 147740 (D. Or. Oct. 21, 2011) ...............................................*passim*

*Ford v. Cascade Health Servs.*,
    2006 U.S. Dist. LEXIS 44970 (D. Or. June 29, 2006) ..................................................9, 24

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
    703 F.2d 534 (9th Cir. 1983) ........................................................16

*Image Tech. Servs. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ......................................................18

*Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*,
    748 F.3d 160 (4th Cir. 2014) ........................................................18

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Asso.*,
    884 F.2d 504 (9th Cir. 1989) ..........................................................4

*Med Vets, Inc. v. VIP Petcare Holdings, Inc.*,
    811 F. App'x. 422 (9th Cir. 2020) ................................................17

*Miler v. TD Bank USA*,
    2022 U.S. Dist. LEXIS 27311 (D. Or. Feb. 15, 2022) ......................8

*Murphy v. United States*,
    2022 U.S. Dist. LEXIS 2299 (D. Or. Jan. 5, 2022)........................7, 8

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
    967 F. Supp.2d 1347 (N.D. Cal. 2013)...........................................11

*Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris*,
    185 F.3d 957 (9th Cir. 1999) ....................................................9, 24

*Pac. Bell Tel. Co. v. IinkLine Communs., Inc.*,
    555 U.S. 438 (2009) ....................................................................15

*Pac. Steel Grp. v. Commercial Metals Co.*,
    2021 U.S. Dist. LEXIS 97113 (N.D. Cal. May 21, 2021)...........10, 11

*Prime Healthcare Servs. v. SEIU*,
    2013 U.S. Dist. LEXIS 104511 (S.D. Cal. July 25, 2013) ...............11

*Prime Healthcare Servs. v. SEIU*,
    642 F. App'x. 665 (9th Cir. 2016) ....................................14, 17, 24

*RB Rubber Prods. v. ECORE Int'l, Inc.*,
    2012 U.S. Dist. LEXIS 33193 (D. Or. Mar. 13, 2012) ..............4, 9, 24

*REX-Real Estate Exch., Inc. v. Brown*,
    2021 U.S. Dist. LEXIS 235892 (D. Or. Dec. 9, 2021).......................8

*Rock the Vote v. Trump*,
    2020 U.S. Dist. LEXIS 202069 (N.D. Cal. Oct. 29, 2020) ...............20

*In re Rubber Chems. Antitrust Litig.*,
    2008 U.S. Dist. LEXIS 98393 (N.D. Cal. Dec. 4, 2008)......................................20

*SC Innovations, Inc. v. Uber Techs., Inc.*,
    434 F. Supp. 3d 782 (N.D. Cal. 2020)................................................................21

*Soja v. Medtronic, Inc.*,
    2019 U.S. Dist. LEXIS 95557 (E.D. Cal. June 6, 2019) ...................................20

*Standfacts Credit Servs. v. Experian Info. Sols., Inc.*,
    294 F. App'x 271 (9th Cir. 2008) .....................................................................24

*Ticketmaster LLC v. Prior*,
    2008 U.S. Dist. LEXIS 120340 (C.D. Cal. Mar. 10, 2008)...........................20, 21

*Trixler Brokerage Co. v. Ralston Purina Co.*,
    505 F.2d 1045 (9th Cir. 1974) ..........................................................................15

*Unigestion Holdings, S.A. v. UPM Tech., Inc.*,
    412 F. Supp. 3d 1273 (D. Or. 2019)................................................... 8, 9, 17, 22

*United Energy Trading, LLC v. Pac. Gas & Elec. Co.*,
    177 F. Supp. 3d 1183 (N.D. Cal. 2016)..............................................................16

*Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ....................................................................................15, 16

*Witt Co. v. Riso, Inc.*,
    948 F. Supp.2d 1227 (D. Or. 2013)..............................................................19, 20

*Yarbrough v. Stryker Corp.*,
    2021 U.S. Dist. LEXIS 13 (D. Or. Jan. 4, 2021) .................................................8

**Statutes**

Oregon Rev. Stat. 646.725 ....................................................................... 9, 24, 25

Oregon Rev. Stat. 646.730 ....................................................................... 9, 24, 25

Sherman Act ...............................................................................................*passim*

## LOCAL RULE 7.1(a) COMPLIANCE

Pursuant to Local Rule 7.1(a), and through their respective counsel, Plaintiff and Counterclaim-Defendant DAT Solutions, LLC ("DAT") and Defendant and Counterclaim-Plaintiff Convoy Inc. ("Convoy") conferred in good faith regarding the relief requested herein, and Convoy opposes the motion.

## MOTION

Pursuant to Federal Rule of Civil Procedure 12(b)(6), DAT respectfully requests that this Court dismiss Convoy's counterclaims in their entirety, and with prejudice.

## MEMORANDUM IN SUPPORT

## PRELIMINARY STATEMENT

Convoy is a sophisticated, private equity backed-entity formed in 2015. In 2016, Convoy began entering into a series of contracts with DAT, through which Convoy purchased the right to use, for limited purposes, enormous amounts of proprietary data and information from various databases developed and maintained by DAT over the course of its 40+ years in the freight markets. Convoy also purchased the right to use DAT's "load board"—a digital marketplace that connects entities that need to have freight shipped ("shippers") with truckers that are available to ship the freight ("carriers").

In 2018, Convoy entered into a contract with DAT that allowed Convoy to continue receiving DAT's proprietary data, and to continue using DAT's load board, on the condition that Convoy refrain from creating a competing load board during the three year term of the contract. The provision did not totally prohibit Convoy from creating a competing load board; it simply prohibited Convoy (i) from doing so while it had access to DAT's proprietary data and information,

and (ii) from using DAT's proprietary data and information (which was developed over many years and with significant investment) to build a competing load board.

Intentionally breaching the contract with DAT, however, Convoy went ahead and created a competing load board while it was accessing DAT's proprietary data and software. In November 2021, Convoy publicly announced its competing load board product, "Convoy for Brokers." In a series of press releases and blog posts, Convoy announced that it had been developing Convoy for Brokers for the preceding year—while it was still under contract with DAT, and while it was accessing DAT's proprietary software and data.

Now—after being sued by DAT for breach of contract and other claims, and after launching its competing load board—Convoy asserts boilerplate counterclaims against DAT for purported violations of state and federal antitrust laws. As shown below, Convoy's counterclaims are a transparent strategic gambit: (i) an *ex post facto* attempt to justify its breach of contract, and (ii) an attempt to use the legal process to artificially gain a competitive edge against DAT. The counterclaims should be dismissed as a matter of law, for at least the following independent reasons:

First, Convoy fails to allege the required restraints of trade or anti-competitive conduct necessary to state a claim for violations of both Sections 1 and 2 of the Sherman Act (Counts One-Three). Courts in the Ninth Circuit (and throughout the country) have repeatedly held that the types of non-compete agreements and "exclusive dealing" arrangements alleged in the Counterclaims are lawful, and pro-competitive under the governing "rule of reason analysis." Because Convoy fails to plead that DAT engaged in any actionable anti-competitive conduct, all of its counterclaims fail.

Second, Convoy has failed to plausibly plead that DAT possesses monopoly power in a defined product market, or has a dangerous probability of obtaining monopoly power in a defined product market, and so its claims for monopolization (Count Two) and attempted monopolization (Count Three) fail as a matter of law for this additional reason. Convoy's allegations regarding DAT's purported "market share" are conclusory and unsupported by any credible methodology or well-pleaded facts. Moreover, Convoy fails to plead that competitors face "barriers to entry" in the market for "spot freight matching services," as would be required to show that DAT has "monopoly power" or has a "dangerous probability" of obtaining it. Indeed, Convoy's Counterclaims suffer from an inherent contradiction: On the one hand, Convoy alleges that DAT wields "monopoly power" and otherwise maintains barriers to entry to prevent competition in the market for "spot freight matching services." But then, on the other hand, Convoy alleges that—in only about one year—it has successfully launched a competing load board that is "smarter" and "does far more" than DAT in the very same market, and admits that there are other significant load board competitors. This contradiction is fatal to Convoy's monopoly claims. *See Am. Prof'l Testing Serv. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns*, 108 F.3d 1147, 1154 (9th Cir. 1997) ("[N]either monopoly power nor a dangerous probability of achieving monopoly power can exist absent evidence of barriers to new entry or expansion.").

Third, Convoy fails to plausibly allege the requisite "antitrust injury" (or injury to competition) necessary to state a claim under the antitrust laws (all Counts). Convoy's complaint has allegations about how its contracts with DAT made it harder for Convoy to launch a competing load board. But the antitrust laws were enacted to protect consumers, not competitors, and "[a]ntitrust complaints that do not focus on injury to consumers are usually unsuccessful."

*Expedite, Inc. v. Plus, Bags, Cars & Serv., LLC*, 2011 U.S. Dist. LEXIS 147740, at *9 (D. Or. Oct. 21, 2011).

Here, Convoy makes speculative and conclusory boilerplate allegations on "information and belief," but fails to plausibly allege that <u>consumers</u> in the market for "spot freight matching services"—shippers, carriers and brokers—have been harmed in any way by the conduct ascribed to DAT. At best, Convoy alleges "mere injury to [its] own position[] as a competitor[]," but this is <u>not</u> sufficient to plead antitrust injury. *Les Shockley Racing, Inc. v. Nat'l Hot Rod Asso.*, 884 F.2d 504, 508 (9th Cir. 1989) (affirming dismissal of Sherman Act claims where plaintiff alleged that defendants' actions "have injured his own business interests," but did not otherwise allege injury to competition).

<u>Fourth</u>, because the Court should find that Convoy's federal Sherman Act antitrust claims fail, it should also dismiss Convoy's parallel claims under Oregon law. *See, e.g., RB Rubber Prods. v. ECORE Int'l, Inc.*, 2012 U.S. Dist. LEXIS 33193, at *28 (D. Or. Mar. 13, 2012) (dismissing, for same reasons, claims under Sherman Act and parallel Oregon antitrust statutes).

For these reasons, and those stated more fully below, DAT respectfully requests that all of Convoy's counterclaims be dismissed, with prejudice.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[1]

### A. The parties and the relevant contracts.

Counterclaim-Defendant DAT was founded in Portland over forty years ago. Today, DAT operates and maintains the most comprehensive "load board" in the United States. ECF No. 36 at ¶¶ 2, 25. A "load board" is a digital marketplace through which "shippers" (entities looking to

---

[1] The factual allegations discussed here are from the Counterclaims, and are taken as true only for purposes of DAT's motion to dismiss.

have freight shipped from one point to another) can connect with "carriers" (truckers and other entities or individuals that can move cargo). *Id.* In addition to its load board, DAT also aggregates information and creates and maintains proprietary databases relating to the freight markets—pricing data, rate data, load-to-truck ratios, and other data that is useful to participants in the freight markets. *Id.* DAT's customers can access DAT's load board and its proprietary databases through subscription agreements that require, *inter alia*, the customers to keep the data and information confidential.

Counterclaim-Plaintiff Convoy was founded in Seattle, Washington, in 2015, by individuals with experience in the tech industry—but not the freight industry. ECF No. 36 at p. 5, ¶ 24. Convoy was purportedly founded as a digital "freight broker." *Id.* at p. 17, ¶ 28. A "freight broker" is an entity hired by "shippers"—entities looking to have freight shipped from one point to another. *Id.* On behalf of its shipper clients, a freight broker finds and hires truckers (or "carriers") to ship the freight. *Id.* The DAT load board is an important tool for brokers, who can access the load board to find carriers to ship their clients' freight. *Id.* at ¶ 2. Likewise, DAT's databases are valuable to brokers, who can use that data to, *inter alia,* ensure that their shipper clients are paying a fair, market rate to ship their goods.

In 2016, Convoy began entering into a series of contracts with DAT, through which Convoy gained access to the DAT load board and to historical and contemporaneous data from DAT's proprietary databases. On November 7, 2018, DAT and Convoy entered into a National Account Agreement. *Id.* at ¶ 57; *see also* ECF No. 36-1. The National Account Agreement governed Convoy's use of DAT's products, and had an initial three-year term. *Id.* at ¶¶ 2(A), 4. In the National Account Agreement, Convoy agreed that it would use DAT's load board and proprietary data in its capacity as a "freight broker." *Id.* at ¶ 3(A). Convoy also agreed that:

"During the Term, Customer [Convoy] may not create a load board wherein they aggregate other brokers' loads with the intent of competing with DAT." *Id.* at ¶ 4. In short, the parties agreed that Convoy could continue using DAT's load board and data to find carriers for Convoy's shipper clients; but Convoy could <u>not</u> create a competing load board of its own while doing so.

Convoy and DAT entered into additional contracts, including a Products and Pricing Supplement dated November 7, 2018. ECF No. 36-2. Through the Products and Pricing Supplement, Convoy agreed that it would posts its shipper clients' loads only to DAT's load board, and not to other load boards, in exchange for a better "Exclusive Price" from DAT. *Id.*; *see also* ECF No. 36 at ¶ 65. On June 18, 2020, the parties amended this agreement so that Convoy could post its shipper clients' loads to other load boards, and not just the DAT load board. As a result, Convoy's monthly rate increased from the "Exclusive Price" of $47,500/month to the "Non-Exclusive Price" of $52,500/month—a modest 10% price differential.

**B.** **Convoy launches its competing load board.**

In November 2021, Convoy announced that it had created its own load board, called "Convoy for Brokers," which it had been developing for the preceding year. *See id.* at ¶ 32. As alleged by Convoy: "<u>Convoy for Brokers competes with DAT in the market for services that match carriers with brokers for spot freight shipments</u>. Both DAT's load board and Convoy for Brokers allow third-party brokers to find capacity by posting shipments and allow carriers to find spot freight loads." *Id.* at ¶ 50 (emphasis supplied). Accordingly, Convoy concedes that its Convoy for Brokers product competes with DAT's load board in the same market.

Convoy also alleges that—notwithstanding DAT's supposed monopoly power and anticompetitive practices—its Convoy for Brokers load board is "smarter" and "does far more" than DAT's "antiquated" load board:

DAT's load board is a large, relatively unmanaged marketplace that simply lists loads and carriers. . . . Convoy for Brokers does far more: by way of examples, Convoy for Brokers uses machine-learning to automatically match carriers and shippers or brokers . . . While DAT's load board is little more than a digital bulletin board, Convoy for Brokers is an end-to-end shipping tool.

*Id.* at ¶¶ 51-53. Convoy further alleges that it built Convoy for Brokers without using any data or information obtained from DAT. *Id.* at ¶ 72. Thus, taking Convoy's allegations as true for purposes of the current motion, Convoy—in only about a year—was able to build, from scratch, a competing load board product that "does far more" than DAT's load board.

### C. DAT commences this Action.

In January 2022, DAT commenced this Action and asserted six claims against Convoy. *See* ECF No. 1. DAT's first two causes of action are for violations of the federal and Delaware trade secrets laws, and the remainder are contract or tort-based. On March 21, 2022, Convoy moved to dismiss five of the six claims asserted by DAT—but tellingly did not move to dismiss the breach of contract claim. Convoy's motion to dismiss is pending before this Court.

On June 17, 2022, Convoy asserted six counterclaims against DAT. As discussed below, the first three counterclaims arise under Sections 1 and 2 of the Federal Sherman Act, and the remaining three counterclaims arise under the parallel Oregon antitrust laws.

### LAW & ARGUMENT

### I. The standards governing this motion, and the required elements of Convoy's counterclaims.

### A. The standards governing this 12(b)(6) motion.

As this Court knows, in order to survive a Fed. R. 12(b)(6) motion to dismiss for failure to state a claim, a complaint or counterclaim must "contain sufficient factual allegations to plausibly suggest an entitlement to relief." *Murphy v. United States*, 2022 U.S. Dist. LEXIS 2299, at *3 (D. Or. Jan. 5, 2022) (Immergut, J.). The plausibility standard requires that well-pleaded facts in

Convoy's counterclaim create "more than a sheer possibility that [the opposing party] has acted unlawfully." *Id.* at *4. Rather, the factual allegations must "allow[ ] the court to draw the reasonable inference that the [opposing party] is liable for the misconduct alleged." When adjudicating a motion to dismiss, a court must "accept as true all well-pleaded material facts alleged in the complaint," but <u>not</u> "credit … legal conclusions that are couched as factual allegations." *Id.* The Court also should not accept conclusory allegations, or allegations that "simply recite the elements of a cause of action." *Id.*; *see also Miler v. TD Bank USA*, 2022 U.S. Dist. LEXIS 27311, at *4 (D. Or. Feb. 15, 2022) (Immergut, J.); *Yarbrough v. Stryker Corp.*, 2021 U.S. Dist. LEXIS 13, at *3-4 (D. Or. Jan. 4, 2021) (Immergut, J.) (same).

**B.    The required elements of Convoy's counterclaims.**

Convoy asserts six counterclaims against DAT.

<u>Count One</u> arises under Section 1 of the Sherman Act, and is for "Illegal Contracts in Restraint of Trade in Violation of 15 U.S.C. § 1." To state a potentially viable claim for unlawful restraint of trade, Convoy must plausibly plead facts to show: "(1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the person or entities intended to harm or restrain trade or commerce among the several states, or with foreign nations; (3) which actually injures competition." *REX-Real Estate Exch., Inc. v. Brown*, 2021 U.S. Dist. LEXIS 235892, at *18 (D. Or. Dec. 9, 2021) (internal quotation omitted).

<u>Count Two</u> arises under Section 2 of the Sherman Act, and is for "Monopolization in Violation of 15 U.S.C. § 2." To state a potentially viable claim for monopolization, Convoy must plausibly plead facts to show: "(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury." *Unigestion*

*Holdings, S.A. v. UPM Tech., Inc.*, 412 F. Supp. 3d 1273, 1284 (D. Or. 2019) (internal quotation omitted).

Count Three arises under Section 2 of the Sherman Act, and is for "Attempted Monopolization in Violation of 15 U.S.C. § 2." To state a potentially viable claim for attempted monopolization, Convoy must plausibly plead "(1) a specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct to accomplish the monopolization; (3) dangerous probability of success; and (4) causal antitrust injury." *Unigestion*, 412 F. Supp. 3d at 1284.

Convoy also asserts three parallel counterclaims under the Oregon state antitrust laws: Count Four for Illegal Contracts in Restraint of Trade in Violation of Oregon Rev. Stat. 646.725; Count Five for Monopolization in Violation of Oregon Rev. Stat. 646.730; and Count Six for Attempted Monopolization in Violation of Oregon Rev. Stat. 646.730. As the Ninth Circuit has observed, the "Oregon antitrust statutes are almost identical to the federal antitrust statutes," and "Oregon courts look to federal antitrust decisions for persuasive guidance in interpreting the state antitrust laws." *Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris*, 185 F.3d 957, 963 n.4 (9th Cir. 1999). Accordingly, if the Court finds that Convoy has failed to sufficiently state claims for violations of the Sherman Act, it should also dismiss the parallel Oregon law claims. *See RB Rubber Prods.*, 2012 U.S. Dist. LEXIS 33193, at *28 (dismissing claims under Sherman Act and parallel Oregon antitrust statutes for the same reasons); *see also Ford v. Cascade Health Servs.*, 2006 U.S. Dist. LEXIS 44970, at *12 (D. Or. June 29, 2006) ("For purposes of this motion, the Oregon antitrust statutes, O.R.S. 646.725 and O.R.S. 646.730, overlap the Sherman Act entirely, and the disposition of the state claims will be identical to that of the federal claims.").

II.     **Convoy fails to sufficiently allege actionable anti-competitive conduct under the Sherman Act (Counts One-Three).**

In order to state a claim under Section 1 or 2 of the Sherman Act, Convoy must plausibly allege an actionable form of anti-competitive conduct. *Expedite*, 2011 U.S. Dist. LEXIS 147740, at *12 ("Though Section 1 and Section 2 claims differ, both require allegations of anticompetitive activity to state a claim."). Convoys fails to do so here.

A.     **Count One – Section 1 of the Sherman Act**

Convoy's claim under Section 1 of the Sherman Act fails because Convoy does not plausibly allege any actionable anti-competitive conduct. In support of its Section 1 claim, Convoy alleges two types of claimed "anticompetitive" conduct—it alleges that DAT (1) "bars its customers from competing with DAT" through non-compete provisions in contracts, ECF No. 36 at ¶¶ 56-63; and (2) "requires customers to use its load board exclusively," *id.* at ¶¶64-67. Neither of these allegations are supported with well-pleaded factual allegations, however, and accordingly Convoy's claims should be dismissed.

As a threshold matter, the conduct ascribed to DAT is not "*per se* illegal" for purposes of Section 1 of the Sherman Act, and should be analyzed under the "rule of reason." Courts in this District have held that "application of the *per se* rule is limited, however, and most courts analyze agreements under the rule of reason." *Expedite*, 2011 U.S. Dist. LEXIS 147740, at *8. The quintessential horizontal agreement that is *per se* illegal is "price fixing," where two competitors agree to artificially manipulate pricing in the market in which they compete. *Pac. Steel Grp. v. Commercial Metals Co.*, 2021 U.S. Dist. LEXIS 97113, at *23 (N.D. Cal. May 21, 2021); *see also Expedite*, 2011 U.S. Dist. LEXIS 147740, at *8 ("Examples of agreements judged under the *per se* rule are agreements between competitors to fix prices or divide markets"—so-called "horizontal" agreements in restraint of trade.).

In contrast, "vertical" restraints—like those between a provider (here DAT) and its customer (here Convoy)—"should nearly always be analyzed under the rule of reason." *Pac. Steel*, 2021 U.S. Dist. LEXIS 97113, at \*23; *see also Orchard Supply Hardware LLC v. Home Depot USA, Inc.,* 967 F. Supp.2d 1347, 1357 (N.D. Cal. 2013) ("METCO's arrangements with its distributors and with wholesale cooperators are vertical agreements," and were thus analyzed under the rule of reason). Here, the conduct ascribed to DAT—the non-compete provisions and claimed exclusive dealing provisions—all arise within vertical relationships between DAT and its customers, therefore Convoy's claims should be analyzed under the "rule of reason" standard.

"The rule of reason requires courts to conduct a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition." *Pac. Steel,* 2021 U.S. Dist. LEXIS 97113, at \*23-24. To prevail under the rule of reason standard, a plaintiff must plead facts which, if true, will prove four elements: (1) a contract, combination or conspiracy among two or more persons or direct business entities; (2) by which the persons or entities intended to harm or restrain commerce . . . (3) which actually injures competition; and (4) that the plaintiff itself was actually harmed by the anti-competitive practice. *Prime Healthcare Servs. v. SEIU*, 2013 U.S. Dist. LEXIS 104511, at \*35 (S.D. Cal. July 25, 2013) (emphasis supplied). The primary difference between a *per se* claim and a rule of reason claim is that, for the latter, the plaintiff must actually plead that the defendant's purported anticompetitive conduct injured competition in the relevant market. *Expedite*, 2011 U.S. Dist. LEXIS 147740, at \*9 ("Under the rule of reason analysis, a plaintiff must allege antitrust injury, that is, that the agreement at issue actually caused injury to competition within a market, beyond its impact on the plaintiff.").

Here, even taking the allegations of the Counterclaims as true, Convoy fails to plead that any of the anticompetitive conduct ascribed to DAT actually injures <u>competition</u>, and therefore Convoy's claim under Section 1 should be dismissed.

    1.  **The so-called "exclusive dealing" provisions are not anti-competitive under Section 1.**

  Convoy alleges that DAT enters into "exclusive dealing" contracts that require brokers and carriers to post loads exclusively to DAT's load board. *See* ECF No. 36 at ¶ 88. Convoy's allegations, however, fail to state a claim under Section 1 of the Sherman Act for several reasons.

  <u>First</u>, Convoy fails to plausibly allege that DAT requires consumers (other than Convoy) to enter into exclusive dealing contracts. While Convoy's Counterclaim contains allegations regarding its own contracts with DAT, Convoy's speculative allegations regarding other consumers' purported "exclusive contracts" with DAT are only made on information and belief: "On information and belief, DAT forces other digitally native broker customers to agree to the same or similar exclusivity provisions as a condition for accessing DAT's products and services . . . ." *Id.* at ¶ 70. These type of generic, boilerplate allegations are insufficient to state a claim under Section 1 of the Sherman Act. For example, in affirming the dismissal of Sherman Act claims based on similar exclusive-dealing allegations, the Ninth Circuit noted that the plaintiff had failed to allege "how many medical providers have in fact entered into agreements" with the defendant, or "how the arrangements actually agreed upon have impacted other laboratories in the plan/outpatient market." *Eastman v. Quest Diagnostics, Inc.*, 724 F. App'x. 556, 558 (9th Cir. 2018). The Ninth Circuit noted that "[t]hese omissions are significant because, without such allegations, there are no facts that allow the court to evaluate the effect of the exclusive dealing arrangements in the" subject market. *Id.*

Similarly here, Convoy fails to identify any other brokers, shippers or carriers who have been "forced" to enter into "exclusive" contracts with DAT, nor how such contracts (if any even exist) have harmed competition in the market for "spot freight rate matching services." Accordingly, Convoy's claim should be dismissed.

Second, even assuming that other brokers, shippers or carriers enter into "exclusive" contracts like those between Convoy and DAT, Convoy's claim would still fail. Convoy alleges that it initially paid a lower price to DAT by agreeing to post freight exclusively to DAT's load board; but that Convoy and DAT later amended the agreement to allow Convoy to post freight to loads boards that compete with DAT. *Supra* at page 9. Convoy alleges that it paid DAT approximately 10% more after negotiating out of the exclusivity provision. *Id.*

Thus, Convoy (and any other consumers that enter into similar "exclusive" contracts with DAT) are not forced to enter into exclusive contracts to do business with DAT—they simply get a 10% discount by agreeing to do so. And, contrary to Convoy's position, courts have made clear that "price discounts are generally not anticompetitive," because "lower prices, as long as they are not predatory, benefit consumers, regardless of how those prices are set." *3Shape Trios A/S v. Align Tech., Inc.*, 2019 U.S. Dist. LEXIS 137982, at *23-24 (D. Del. Aug. 15, 2019); *see also Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 226-27 (1993) ("[C]utting prices in order to increase business often is the very essence of competition," and "mistaken inferences are especially costly, because they chill the very conduct the antitrust laws are designed to protect."). In short, Convoy's allegation regarding its contracts with DAT do <u>not</u> show injury to competition. And this is confirmed by Convoy's allegations in the Counterclaims, which make clear that brokers and shippers are free to "choose to use another" load board service. *Supra* at Section II(B).

For all these reasons, Convoy has failed to plausibly plead a potentially viable claim under the rule of reason that DAT's so-called "exclusive contracts" violate Section 1 of the Sherman Act. *See Expedite*, 2011 U.S. Dist. LEXIS 147740, at *9 ("Antitrust laws are focused on protecting consumers, not vendors. In this instance, the ultimate consumers—the airlines at PDX—presumably <u>benefitted</u> from both restraints by paying less for baggage delivery services. . . . These results are pro-competitive, not anticompetitive, and not actionable under anti-trust laws.").

### 2. The limited non-compete provisions are lawful.

Convoy also alleges that DAT engages in restraints of trade by "barring its customers from competing with DAT." ECF No. 36 at ¶¶ 56-63. These allegations also fail to state a claim under Section 1 of the Sherman Act.

<u>First</u>, Convoy again fails to plausibly allege that DAT requires consumers (other than Convoy) to enter into non-compete provisions. Convoy alleges that it agreed to a provision in its 2018 National Account Agreement that prohibited Convoy from creating a competing load board during its three year term. *Supra* at page 9. But Convoy's speculative allegations regarding other consumers' purported non-compete provisions are again made only on information and belief: "On information and belief, DAT has imposed similar competition prohibitions on other digitally native DAT customers . . . ." *Id.* at ¶ 63. These speculative, boilerplate allegations are insufficient to plead or show that <u>consumers</u>—rather than simply Convoy itself—have been harmed at all by DAT's purported anticompetitive conduct. Accordingly, Convoy's claim fails, because the allegations lack the requisite "factual support needed" to demonstrate any "anticompetitive effects" within the market for spot freight matching services. *Prime Healthcare Servs. v. SEIU*, 642 F. App'x. 665, 666 (9th Cir. 2016).

<u>Second</u>, even assuming that other persons besides Convoy enter into these sorts of non-compete provisions with DAT, Convoy has still failed to plead that these provisions are anti-

competitive under the rule of reason. Ninth Circuit courts, and other courts throughout the country, have repeatedly held that <u>non-compete provisions are lawful and appropriate under the Sherman Act where they are reasonable in scope and duration and serve a legitimate business purpose</u>. *See, e.g., Trixler Brokerage Co. v. Ralston Purina Co.*, 505 F.2d 1045, 1050-51 (9th Cir. 1974). Here, the non-compete provision in Convoy's National Account Agreement lasted for only the three-year duration of the Agreement. *Allstate Ins. Co. v. Rote*, 2016 U.S. Dist. LEXIS 104374, at *12 (D. Or. Aug. 7, 2016) (non-compete that extended one year after the termination of the business relationship was reasonable); *Actuant Corp. v. Huffman*, 2005 U.S. Dist. LEXIS 49629, at *12 (D. Or. Feb. 18, 2005) (same). The provision also served a legitimate business interest of DAT: it prohibited Convoy from setting up a competing load board at the same time Convoy had access to DAT's proprietary data, information and software, which could be improperly used by Convoy (or any other potential competitor) to take a short-cut to creating a competing load board. This is a perfectly legitimate contract provision, as DAT is entitled to take measures to protect its proprietary data and information from being used by competitors. As the United States Supreme Court has held, "there is no duty to aid competitors" under the antitrust laws. *Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004).

Convoy essentially wants to eat its cake, and have it too. It wanted to have access to DAT's load board and proprietary information, and it also wanted to create a competing load board at the same time (but without putting in decades of innovation and investment, like DAT). The provision in Convoy's National Account Agreement was lawfully designed to prevent unfair piggybacking off of DAT's years of investment and development, and DAT "has no duty to deal under terms and conditions that [its] rivals find commercially advantageous." *Pac. Bell Tel. Co. v. IinkLine Communs., Inc.*, 555 U.S. 438, 450 (2009); *see also Corsearch, Inc. v. Thomson & Thomson*, 792

F. Supp. 305, 321 (S.D.N.Y. 1992) (declining to find an antitrust violation for a contractual provision "designed and intended to prevent [the plaintiff's] ability to piggyback on [the defendant's] copyrighted materials."). Accordingly, Convoy has failed to plausibly plead that the non-compete provision violates Section 1 of the Sherman Act, and this claim should be dismissed.

**B.      The Section 2 claims fail for the same reasons—no anticompetitive conduct.**

Convoy's claims under Section 2 of the Sherman Act, for Monopolization (Count Two) and Attempted Monopolization (Count Three) fail for the same reason. Each claim requires Convoy to plausibly plead facts showing an actionable type of anticompetitive conduct. Specifically, to state a claim for monopolization, Convoy must plausibly plead "the willful acquisition or maintenance" of monopoly power through some anticompetitive conduct; and, to state a claim for attempted monopolization, Convoy must plausibly plead "predatory or anticompetitive conduct to accomplish" monopolization. *Supra* at Section I(B).

Here, Convoy's Section 2 claims primarily are predicated on the same anticompetitive conduct upon which its Section 1 claim is predicated—namely, the "exclusive" posting and non-compete provisions in Convoy's contracts with DAT. Because the conduct Convoy alleges in support of its Section 1 claim "is not anticompetitive, it is of no assistance to [its] efforts to state a claim for relief for monopolization or attempted monopolization, both of which require at least some allegation of anticompetitive conduct." *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 543 (9th Cir. 1983) (affirming dismissal of Section 2 claims where plaintiff had failed to sufficiently allege anticompetitive conduct in support of Section 1 claim); *see also Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409-411 (2004) (reversing appellate court, and finding that Section 2 claims failed for failure to adequately allege anticompetitive conduct); *United Energy Trading, LLC v. Pac. Gas & Elec. Co.*, 177 F. Supp. 3d 1183, 1192-93 (N.D. Cal. 2016) (dismissing Section 2 claim for failing to allege anticompetitive

conduct).  Accordingly, Counts Two and Three should also be dismissed for failure to plausibly

plead a cognizable form of anticompetitive conduct by DAT.[2]

### III.     Convoy fails to adequately allege monopoly power.

Convoy's claims for monopolization and attempted monopolization under Section 2 of the

Sherman Act should also be dismissed because Convoy has failed to plausibly allege that DAT

has "monopoly power," or has a dangerous probability of achieving "monopoly power," as

required to state claims under Section 2 of the Sherman Act.

To state a potentially viable claim for monopolization or attempted monopolization, a

plaintiff "must plausibly allege that defendants have power within the relevant market."  *Med Vets,*

*Inc. v. VIP Petcare Holdings, Inc.*, 811 F. App'x. 422, 423 (9th Cir. 2020) (affirming dismissal of

claims for monopolization and attempted monopolization where plaintiff "did not plausibly allege

market power"); *see also Prime*, 642 F. App'x. at 667 (affirming dismissal of monopolization and

attempted monopolization claims where plaintiff failed to "show possession of monopoly power

in the relevant market").  "Monopoly power, for the purpose of Section 2 of the Sherman Act, is

the power to control prices or exclude competition."  *Unigestion Holdings,* 305 F. Supp. 3d at

1148.

Although the analysis for a monopolization claim and an attempted monopolization claim

is slightly different, Convoy fails under both frameworks.

#### A.     Monopolization (Count Two).

Convoy pleads that the relevant product market is the "spot freight matching services

market."  ECF No. 36 at ¶ 54.  Even assuming for purposes of this motion that this is a distinct

---

[2] To the extent that Convoy alleges that DAT used anticompetitive "scare tactics," ECF No. 36 at
¶¶ 95, 101, those allegations are impermissibly vague under *Twombly*.  Further, to the extent the
alleged "scare tactics" refer to the non-compete or exclusive listing for a discount contract
provisions, those are lawful for the reasons already stated.

legally cognizable product market, Convoy has failed to plausibly plead that DAT possess "monopoly power" in this market, and therefore its claim for monopolization (Counterclaim Two) fails for this additional reason.

Convoy attempts to plead "monopoly power" with a conclusory allegation that "DAT's load board has over 64% share of the relevant market . . . ." *Id.* at ¶ 45. But this fails, because "[c]ourts generally require a 65% market share to establish a prima facie case of market power." *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) (citing *American Tobacco Co. v. U.S.*, 328 U.S. 781, 797 (1946)); *see also Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1029 (N.D. Cal. 2021) ("The threshold of market share for finding a *prima facie* case of monopoly power is generally no less than 65% market share."). "A more conservative threshold would require a market share of 70% or higher for monopoly power." *Epic Games*, 559 F. Supp. 3d at 1029; *see also Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 174 (4th Cir. 2014) ("[T]he Supreme Court has never found a party with less than 75% market share to have monopoly power.").

Accordingly, Convoy has not made a *prima facie* showing of market power in support of its claim for monopolization. Further, while Convoy's 64% allegation is admittedly close to the required threshold, at least two other factors further show that Convoy has failed to adequately plead monopoly power. <u>First</u>, Convoy fails to plead any factual basis for the 64% number; there are no factual allegations in the Complaint to support this number or show the methodology used by Convoy to support its conclusory statement that DAT possesses "over 64% share" of the market for spot freight matching services. This is the type of "conclusory statement" of market power that courts in this District have found to be insufficient to state a claim for monopolization under the Sherman Act. *Aaronson v. Kangarani*, 2019 U.S. Dist. LEXIS 127890, at *12 (D. Or. June

20, 2019) (dismissing Sherman Act claims where plaintiff failed to plead credible allegations regarding "defendants' market share").

Second, and more importantly, Convoy must also plausibly plead barriers to entry in the "spot freight matching services" market to show that DAT has monopoly power, even if it had adequately pleaded market share:

> Plaintiff must plead allegations regarding barriers to entry and the lack of ability by competitors to increase their share of the market. . . While the Complaint alleges that defendant possesses 65% of the market . . . there are insufficient allegations establishing barriers to entry . . . As a result, the complaint fails to adequately plead market power.

*Witt Co. v. Riso, Inc.*, 948 F. Supp.2d 1227, 1244 (D. Or. 2013) (dismissing Section 1 claim on statute of limitations grounds, but noting that plaintiff also failed to allege significant barriers to entry sufficient to allege market power); *see also Am. Prof'l Testing Serv. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns*, 108 F.3d 1147, 1154 (9th Cir. 1997) ("[N]either monopoly power nor a dangerous probability of achieving monopoly power can exist absent evidence of barriers to new entry or expansion."). Convoy's counterclaims include boilerplate general allegations regarding "barriers to entry," but these allegations are not supported by any case-specific plausible factual allegations.

In fact, Convoy's "monopoly power" and "barriers to entry" allegations are contradicted and rendered implausible by its own counterclaims. Contrary to its conclusory allegation that DAT has created "barriers to entry," Convoy alleges that in only about a year it has been able to conceive, develop and launch its own "far superior" competing product in the market for "spot freight matching services." ECF No. 36. Accordingly, Convoy's own allegations show that there are no barriers to entry in the market for "spot freight matching services." Moreover, in addition to its own Convoy for Brokers product, Convoy also admits that there other very prominent

competitors in this market, like Truckstop.com[3], and that consumers are free to "choose to use another" load board "service in addition to DAT." *Id.* at ¶¶ 43, 46. Convoy's allegations show that DAT does <u>not</u> wield monopoly power. *Witt,* 948 F. Supp. 2d at 1244; *see also In re Rubber Chems. Antitrust Litig.*, 2008 U.S. Dist. LEXIS 98393 (N.D. Cal. Dec. 4, 2008) (dismissing Sherman Act claims where the "presence of other potential or actual competitors argues against the likelihood of anticompetitive harm").

In sum, Convoy has failed to plead the requisite monopoly power to state a potentially viable claim for monopolization, because (i) Convoy's 64% market share number is conclusory, speculative, and does not establish a *prima facie* showing of monopoly power anyway; and (ii) Convoy has failed to sufficiently plead barriers to entry. Accordingly, the monopolization claim should be dismissed.

### B.    Attempted Monopolization (Count Three).

To state a potentially viable claim for attempted monopolization, Convoy must plausibly allege facts showing a "dangerous probability" that DAT "will be successful in its alleged plan" to monopolize the spot freight matching services "market." *Ticketmaster LLC v. Prior*, 2008 U.S. Dist. LEXIS 120340, at *15 (C.D. Cal. Mar. 10, 2008). "Failure to allege a dangerous probability

---

[3] Indeed, Truckstop.com boasts that *it* built the first online load board and transformed the industry—claiming an annual revenue of between $110-120 million. *See*, *e.g.*, https://truckstop.com/about/; https://www.freightwaves.com/news/trucking/iconiq-capital-invests-in-truckstopcom-at-1b-valuation#:~:text=Truckstop.com's%20annual%20revenue%20is,the%20%24110%2D120%20million%20range. Information that is publicly available from websites may be considered on a motion to dismiss. *See Soja v. Medtronic, Inc.*, 2019 U.S. Dist. LEXIS 95557, at *4 (E.D. Cal. June 6, 2019); *Rock the Vote v. Trump*, 2020 U.S. Dist. LEXIS 202069, at *12 n.2 (N.D. Cal. Oct. 29, 2020).

of success of achieving monopoly power" in this market "is grounds for dismissal of" Convoy's claim for attempted monopolization. *Id.*

"[T]he same flaw discussed above in the context of [Convoy's] monopolization claim also warrants dismissal of its attempted monopolization claim." *SC Innovations, Inc. v. Uber Techs., Inc.*, 434 F. Supp. 3d 782, 794 (N.D. Cal. 2020). While an allegation of market share below 65% can sometimes be sufficient to make a *prima facie* showing under the dangerous probability prong, Convoy's conclusory "64% market share" allegation should not be credited because, as discussed above, there are insufficient factual allegations to support this number.

Moreover, as the Ninth Circuit has made clear, "a dangerous probability of achieving monopoly power" cannot exist "absent evidence of barriers to new entry or expansion." *See Am. Prof'l Testing Serv.*, 108 F.3d at 1154. Neither a claim for monopolization or attempted monopolization can succeed if it is undisputed that "competitors have expanded output in the recent past or have the ability to expand output in the future." *Id.; see also Coca-Cola Bottling Co. v. Coca-Cola Co.*, 696 F. Supp. 97, 130 (D. Del. 1988) (noting that courts look to "the existence of competitors as evidence of countervailing power which would preclude monopolization"). Here, as shown above, Convoy's own allegations—its own purported success in rapidly introducing a new competing load board, Truckstop.com's load board market share, and consumers' abilities to "choose to use another" load board—all show that Convoy has not pleaded (and cannot plead) that DAT has a dangerous probability of monopolizing the market for "spot rate freight matching services." Accordingly, Convoy's claim for attempted monopolization should be dismissed.

**IV. Convoy fails to sufficiently allege the requisite antitrust injury to competition (All Counts).**

Independent from the above arguments, all of Convoy's counterclaims should be dismissed because Convoy fails to plausibly plead the required element of "antitrust injury." *See supra* at Section I(B). To adequately allege antitrust injury, "[a] plaintiff must demonstrate injury to competition in the market as a whole, not merely injury to itself as a competitor." *CollegenNET, Inc. v. Common Application, Inc.*, 104 F. Supp. 3d 1137, 1147 (D. Or. 2015) (granting motion to dismiss for failure to allege antitrust injury); *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012) ("plaintiffs must plead an injury to competition beyond the impact on the plaintiffs themselves.").

Here, as shown above, Convoy has failed to plead any unlawful conduct by DAT, and therefore has failed to satisfy the first prong of showing antitrust injury. *See Unigestion*, 305 F. Supp. 3d at 1153-54 ("As explained above, UPM has not alleged anticompetitive conduct. Thus, any injury that UPM alleges that it has suffered does not flow from that which makes the conduct unlawful."). Moreover, even if the Court were to find that any of the alleged conduct by DAT was unlawful, Convoy has not pleaded any injuries that are "of the type the antitrust laws were intended to prevent." Courts interpreting this prong have made clear that it requires a showing of injury to "competition in the market." *Id.* (emphasis supplied). A plaintiff can only adequately plead an injury to competition in the market by pleading that consumers generally (as opposed to another competitor) have been harmed by the defendant's purported anticompetitive conduct. *Id.* As one court in this District has observed: "Congress designed the Sherman Act to protect consumers or purchasers of goods in a market. Accordingly, antitrust injury manifests as higher prices, lower output, or decreased quality in the products within a defined market. Antitrust complaints that do not focus on injury to consumers are usually unsuccessful." *Expedite*, 2011 U.S. Dist. LEXIS

147740, at *9 (emphasis supplied); *see also Eastman,* 724 F. App'x. at 557 (dismissing monopolization claim because "[t]he Sherman Act is not directed against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.").

Here, Convoy alleges that the consumers are brokers, carriers and shippers in the "market" for "spot freight matching" services. But Convoy does not plausibly plead sufficient facts that these consumers have been harmed, in any way, by the purported anticompetitive conduct ascribed to DAT. Instead, Convoy relies entirely on general, formulaic phrases parroting the elements it would be required to show, alleging in conclusory fashion that consumers are "forced" to pay "higher prices" or receive "reduced quality" of services. ECF No. 36 at ¶ 96. There are no well-pleaded facts in the Counterclaims to support these generic, boilerplate allegations. Which consumers (if any) are paying more? How much more are they paying? How, and how much, has the overall quality of service generally to consumers gone down (if at all) as a result of DAT's purported anticompetitive behavior? None of these foundational facts are pled in the Counterclaims.

Similarly, Convoy makes a conclusory allegation that consumers have been harmed because DAT's purported anticompetitive conduct has "stifled innovation in the trucking industry." *Id.* at ¶ 96. Once again, however, this conclusory theory of antitrust injury is belied by Convoy's own allegation that, in about a year, it has created a "smarter" load board that "does far more" than DAT's "antiquated" load board. If Convoy's allegations are to be believed (which they are for purposes of this motion), then innovation is alive and well in the market for spot freight matching services—and Convoy is a shining example.

In short, instead of adequately pleading antitrust injury, Convoy relies entirely on the type of boilerplate, conclusory allegations that courts have <u>declined</u> to credit on a motion to dismiss. *See, e.g., Brantley*, 675 F.3d at 1202 (conclusory "allegations that an agreement has the effect of reducing consumers' choices or increasing prices to consumers does not sufficiently allege an injury to competition."); *Prime*, 642 F. App'x. at 666 (same); *Standfacts Credit Servs. v. Experian Info. Sols., Inc.*, 294 F. App'x 271, 272 (9th Cir. 2008) (affirming dismissal of antitrust case because "conclusory allegations and unreasonable inferences [were] insufficient to defeat a motion to dismiss.") (internal citation omitted). Accordingly, all of Convoy's claims under the Sherman Act should be dismissed.

**V.     Convoy's state law claims also should be dismissed.**

Convoy asserts three claims under the Oregon antitrust laws, which mirror exactly the claims asserted under the Sherman Act: <u>Count Four</u> for Illegal Contracts in Restraint of Trade in Violation of Oregon Rev. Stat. 646.725 (mirroring <u>Count One</u>); <u>Count Five</u> for Monopolization in Violation of Oregon Rev. Stat. 646.730 (mirroring <u>Count Two</u>); and <u>Count Six</u> for Attempted Monopolization in Violation of Oregon Rev. Stat. 646.730 (mirroring <u>Count Three</u>).

As the Ninth Circuit has observed, the "Oregon antitrust statutes are almost identical to the federal antitrust statutes," and "Oregon courts look to federal antitrust decisions for persuasive guidance in interpreting the state antitrust laws." *Oregon Laborers-Employers Health & Welfare Trust Fund*, 185 F.3d at 963 n.4. Therefore, since the Court should find that Convoy has failed to sufficiently state claims for violations of the Sherman Act (as shown above), it should also dismiss the parallel Oregon law claims. *See RB Rubber Prods.*, 2012 U.S. Dist. LEXIS 33193, at *28 (dismissing, for same reasons, claims under Sherman Act and parallel Oregon antitrust statutes); *see also Ford*, 2006 U.S. Dist. LEXIS 44970 ("For purposes of this motion, the Oregon antitrust

statutes, O.R.S. 646.725 and O.R.S. 646.730, overlap the Sherman Act entirely, and the disposition of the state claims will be identical to that of the federal claims.").

## **<u>CONCLUSION</u>**

For the foregoing reasons, DAT respectfully requests dismissal of all Convoy's counterclaims, with prejudice.

DATED this 22nd day of July 2022.

BUCKLEY LAW P.C.

By:____*/s/ Marjorie A. Elken*_____
    Marjorie A. Elken, OSB No. 073368
    mae@buckley-law.com
    5300 Meadows Road, Suite 200
    Lake Oswego, OR 97035
    Telephone: 503-620-8900
    Facsimile: 503-620-4878

    Damond R. Mace (admitted *pro hac vice*)
    Sean L. McGrane (admitted *pro hac vice*)
    Marissa Black (admitted *pro hac vice*)
    damond.mace@squirepb.com
    sean.mcgrane@squirepb.com
    marissa.black@squirepb.com
    SQUIRE PATTON BOGGS (US) LLP
    1000 Key Tower
    127 Public Square
    Cleveland, OH 44114
    Telephone: 216-479-8500
    Facsimile: 216-479-8780

    *Attorneys for Plaintiff DAT Solutions, LLC*

## CERTIFICATE OF SERVICE

I certify that I served or caused to be served a full, true, and complete copy of the

foregoing **DAT SOLUTIONS, LLC'S MOTION TO DISMISS CONVOY, INC.'S**

**COUNTERCLAIMS** on the party or parties listed below as follows:

Per A. Ramfjord
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
per.ramfjord@stoel.com

*Attorneys for Defendant*

Jason B. Mollick
Praatika Prasad
WILSON SONSINI GOODRICH & ROSATI
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
jmollick@wsgr.com
pprasad@wsgr.com

*Attorneys for Defendant*

Amy H. Candido
Charles Tait Graves
Jordan R. Jaffe
Jordan A. Nelson
Justina Sessions
WILSON SONSINI GOODRICH & ROSATI
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
acandido@wsgr.com
tgraves@wsgr.com
jjaffe@wsgr.com
jordan.nelson@wsgr.com

*Attorneys for Defendant*

☐ by **MAILING** in a sealed, postage-paid envelope, addressed as shown above, and deposited with the U.S. Postal Service at Lake Oswego, Oregon, on the date set forth below;

☐ by **EMAILING** to the email address set forth above on the date set forth below;

☒ by **ELECTRONIC SERVICE** through the CM/ECF system, on the date set forth below.

DATED:      July 22, 2022.

BUCKLEY LAW P.C.

By:＿＿*/s/ Marjorie A. Elken*＿＿＿＿＿＿
    Marjorie A. Elken, OSB No. 073368
    mae@buckley-law.com
    *Attorneys for Plaintiff*